IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

ESTATE OF WILBERT LEE          §
HENSON, et al.,                §
                               §
            Plaintiffs,        §
                               §
V.                             §        CIVIL ACTION NO. 7:06-CV-44-O
                               §        ECF
WICHITA COUNTY, TEXAS, et al., §
                               §
            Defendants.        §

**MEMORANDUM OPINION AND ORDER**

Before the Court are the following:

1.  Defendant Kaye Krajca's Motion for Summary Judgment (Doc. # 112), filed August 12, 2008;

2.  Appendix to Defendant Krajca's Motion for Summary Judgment (Doc. # 112), filed August 12, 2008;

3.  Defendant Michelle George's Motion for Summary Judgment (Doc. # 113), filed August 12, 2008;

4.  Appendix to Defendant George's Motion for Summary Judgment (Doc. # 113), filed August 12, 2008;

3.  Plaintiffs' Response to Defendant George and Krajca's Motions for Summary Judgment (Doc. # 137), filed September 19, 2008;

4.  Plaintiffs' Appendix in Support (Doc. # 138), filed September 19, 2008;

5.  Defendant George's Reply to Plaintiffs' Response (Doc. # 142), filed October 6,

2008;

  6. Defendant George's Supplemental Appendix (Doc. # 142), filed October 6, 2008;

  7. Defendant Krajca's Reply to Plaintiffs' Response (Doc. # 143), filed October 6, 2008;

  8. Defendant Krajca's Supplemental Appendix (Doc. # 143), filed October 6, 2008; and

  9. Defendants George and Krajca's Objection to Plaintiffs' Response to Motion for Summary Judgment (Doc. # 144), filed October 6, 2008.

  Having reviewed the relevant filings, the evidence, and the law applicable to the issues raised, the Court finds as follows:

I. Background

  Plaintiffs are the daughters and estate of Wilbert Henson ("Henson"), who died while being detained at the Wichita County Jail. Henson was arrested on November 23, 2004 on a bond forfeiture warrant for driving with a suspended license. Henson was taken to Wichita County Jail, where Michelle George ("George") and Kaye Krajca ("Krajca") were part of the nursing staff. At book-in, Henson complained of trouble breathing. Nurse George came to see Henson in the front tank. Henson told her that he had Chronic Obstructive Pulmonary Disease ("COPD") and emphysema, and also stated that he had recently been to the emergency room, where he was told he had pneumonia. Henson also informed Nurse George that at the emergency room, he was given prescriptions for a "Z-pac" antibiotic, prednisone, and an inhaler, but that he had not filled these prescriptions. Nurse George gave Henson an antibiotic, Keflex, and also gave Henson an albuterol inhaler. Nurse George also filled out a "pink card" requesting that Henson be put on the "doctor's call," which was scheduled to be held the next morning at

the downtown jail.[1]

That night, sometime after his visit with Nurse George, Henson was transferred from the downtown jail to the another jail facility called "the annex."  Since Henson was on the doctor's call for the downtown jail, and not the annex, Henson did not see a doctor the morning after book-in.   Nurse George knew there was a possibility that Henson would be transferred prior to the doctor's call.  When George arrived at the downtown jail on Wednesday, November 24, 2004, she saw that Henson had been transferred to the annex.  George called the nurse at the annex and asked that Henson be placed on the next doctor's call at that facility.  Usually, the jail physician, Dr. Bolin, would have doctor's calls at the annex on Thursdays.  However, November 25, 2004 was Thanksgiving Day, and Dr. Bolin did not hold a doctor's call that day.

While at the annex, Henson complained to detention officers about his breathing, and other inmates noticed Henson having difficulty breathing and requested medical treatment on his behalf.  *See* Pl's App. at 59-65.  Around noon on November 26, 2004, Nurse Krajca was called to the annex.  Henson informed Nurse Krajca that he had COPD and pneumonia, and had been to the hospital recently and had an antibiotic prescription.  Nurse Krajca filled out a pink card for Henson to see Dr. Bolin at the next doctor's call, and also gave Henson a breathing treatment.[2]

In the evening on November 27, 2004, a detention officer called Nurse George and then Nurse Krajca regarding Henson and both nurses authorized moving Henson to a medical

---

[1] Pink cards are cards that could be filled out by inmates or nurses to request that an inmate receive medical attention.  Cards requesting simple or routine care, such as requests for cough drops or laxatives, were separated from cards requesting a doctor's attention.  Cards for the downtown jail facility were kept separate from cards for inmates at the annex jail facility.

[2] The record indicates that breathing treatments delivered the same medication, albuterol, that was in Henson's personal inhaler, but that the manner of delivery was different.  Pl's App. at 10.

3

segregation cell (also known as "solitary" and the "doom room").  Nurse George was called first.

It is not clear from the record whether the detention officer called to advise Nurse George

regarding Henson's trouble breathing, and that Nurse George suggested moving Henson to

medical solitary based on this information, or whether the detention officers wanted to move

Henson to solitary for some other reason, but needed a nurse to authorize the move.  George

authorized moving Henson to solitary, and asked that Henson be observed every fifteen minutes

after being moved to solitary.  Nurse Krajca was then contacted.  It is not clear from the record

whether the detention officers called Nurse Krajca because of their concern for Henson's well-

being, or because they did not want to have to observe Henson every fifteen minutes and were

hoping Nurse Krajca would say the fifteen minute observation period was not necessary.  Nurse

Krajca authorized moving Henson to solitary, and asked that he be observed every thirty

minutes.

Around 11:00 p.m. on November 27, 2004, Henson's vital signs were assessed, showing

a blood pressure reading of 208/107 and a heart rate of 92 beats per minute.[3]  Pl's App. at 21, 27.

It was also noted that Henson was sweating profusely at that time.  *Id.* at 21-22.  There is a

dispute in the evidence as to whether Nurse Krajca was told this information.  Pl's App. 19-25;

Krajca's Sup. App. 85-88.

After Nurse George and Krajca provided authorization, Henson was moved to a medical

segregation cell.  The medical segregation cell was enclosed, and detention officers did not go

into the cell to observe Henson, instead observing him through a small window in the cell door.

---

[3] It is unclear on the record before the Court whether Henson's vitals were taken before or after
he was moved to a medical segregation cell.

4

Krajca's Sup. App. at 84.  The detention officers kept an "inspection record" regarding their observations, marking down one of eighteen "codes" regarding what Henson was doing at a particular time.[4]  *See* Pl's App. at 27-28; *see also* George's Sup. App. at 70.

While in solitary, Henson was allowed breathing treatments every four hours.  Pl's App. at 18.  The inspection records indicate that Henson received breathing treatments, administered by detention officers, at 2:15 a.m., 7:27 a.m., and 4:00 p.m. on November 28, 2004.  *Id.* at 27.  Henson received another breathing treatment at 3:25 a.m. on November 29, 2004.  *Id.* at 28.

At some point in the early morning hours on November 29, 2004, detention officers went to Henson's cell and found him in severe respiratory distress.  Pl's App. at 99.  He was unable to walk or stand due to his severely deteriorated medical condition and shortness of breath.  *Id.*  Henson stated that he was "not going to make it."  *Id.*  As there was no nurse on duty, Nurse Ingram was called, and ordered that Henson be placed in a wheelchair and moved to a different room to administer a breathing treatment.  *Id.*  Henson's vital signs were again assessed, showing a blood pressure reading of 231/151 and a heart rate of 53 beats per minute.  Jail employees attempted to administer the breathing treatment shortly after 5:00 a.m., but Henson was too weak to hold the hand-held breathing device, and became incoherent and lethargic. *Id.* at 29.  A detention officer attempted unsuccessfully to hold the device near Henson's mouth in order to administer the medication.  Henson told the detention officers "I'm done.  I'm not gonna [sic] make it."  Detention officers then began to massage Henson's shoulders and fan him with a tupperware lid, while trying to "motivate him to stay alive."  *Id.* at 99.  After a minute or two of

---

[4]  For example, the officers marked "A" in the "remarks" section of the inspection record if Henson was awake, "S" if he was sleeping, and "D" if Henson was "at door."  Pl's App. at 27.

struggling, Henson passed out, began "gurgling," and his eyes rolled back in his head.  *Id.*

Henson was rushed to the hospital where he died.  The Tarrant County Medical Examiner

reported his cause of death as chronic obstructive pulmonary disease.

Plaintiffs filed this lawsuit on March 27, 2006, bringing claims arising out of Henson's

death against Wichita County, Sheriff Callahan, Nurse Krajca, and Nurse George.[5]  With respect

to jail nurses Krajca and George, Plaintiffs allege these nurses were deliberately indifferent to

the constitutional rights of Mr. Henson guaranteed by the Fourth and Fourteenth Amendments.

Plaintiffs also seek damages under the Texas Survival Statute and Texas Wrongful Death Act.

On August, 12, 2008, Defendants George and Krajca each filed motions for summary

judgment.  They argue that they are entitled to summary judgment on Plaintiffs' claims under the

Fourth and Fourteenth Amendment, and under state law.

The issues have been briefed, and these motions are ripe for determination.

II.    Legal Standards

Summary judgment is proper when the pleadings and evidence on file show that no

genuine issue exists as to any material fact and that the moving party is entitled to judgment as a

matter of law.  FED. R. CIV. P. 56(c).  "[T]he substantive law will identify which facts are

material."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A genuine issue of

material fact exists "if the evidence is such that a reasonable jury could return a verdict for the

non-moving party."  *Id.*  The movant makes a showing that there is no genuine issue of material

fact by informing the court of the basis of its motion and by identifying the portions of the record

---

[5]  Various detention officers and other jail employees were also sued, but were dismissed in their individual capacities from this action after a stipulation of dismissal, signed by the parties, was filed.

which reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(c).

Once the movant makes this showing, the non-movant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323-24. To carry this burden, the "opponent must do more than simply show. . . some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Instead, the non-movant must show that the evidence is sufficient to support a resolution of the factual issue in his favor. *Anderson*, 477 U.S. at 249. Neither conclusory allegations nor unsubstantiated assertions will satisfy the non-movant's summary judgment burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Summary judgment in favor of the defendant is proper if, after adequate time for discovery, the plaintiff fails to establish the existence of an element essential to her case and to which she will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

When weighing the evidence on a motion for summary judgment, the Court must decide all reasonable doubts and inferences in the light most favorable to the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The Court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. As long as there appears to be some support for the disputed allegations such

7

that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Id.* at 250.

III.     Preliminary Matters

As a preliminary matter, the Court finds it necessary to address George and Kracja's Objection to Plaintiffs' Response to Motions for Summary Judgment (Doc. # 144), filed October 6, 2008.

In their objection, Defendants first argue that Plaintiffs' response violates Local Rule 56 because it is directed to both of Defendants' summary judgment motions, and because Plaintiffs failed to include a succinct recitation of the legal and/or factual grounds on which Plaintiffs rely. Defendants ask the Court to strike Plaintiffs' response in its entirety.

The Court declines to exercise whatever discretion it may have to strike Plaintiffs' entire response. While it would have been prudent for Plaintiffs to have obtained leave to file a single response to Defendants' motions, the Court does not find the single response has prejudiced Defendants. In fact, the single response may have been to Defendants' benefit, as Plaintiffs were constrained by the page limits for a single response. Further, Local Rules should not be enforced in a way that causes a party to lose any right because of a nonwillful failure to comply. *See* FED. R. CIV. P. 83(a)(2).

Defendants also ask the Court to strike factual allegations in Plaintiffs' response. Defendants argue that Plaintiffs, in their response, cite evidence that does not support the "fact" for which it was cited and also cite evidence not found in Plaintiffs' appendix. Defendants also take issue with the manner in which Plaintiffs have numbered some pages in their appendix.

While some of Defendants' criticisms are valid, the Court declines to exercise whatever

discretion it has to strike factual allegations in Plaintiffs' response.  Defendants have not pointed

to anything demonstrating that Plaintiffs or their counsel intentionally cited evidence not before

the Court, or misnumbered pages in order to cause confusion or prejudice to Defendants.  While

it appears that Plaintiffs' counsel was very sloppy in preparing Plaintiffs' response and appendix,

and has not exhibited the attention to detail the Court expects from a member of the federal bar,

the Court does not find it appropriate to punish Plaintiffs by striking factual allegations in their

response, particularly as there has been no showing of prejudice to Defendants.  The Court notes

that it does not take as true statements parties assert in their briefs, but instead considers the

admissible evidence before the Court in resolving motions for summary judgment.  Additionally,

the Court finds sanctions would be inappropriate considering that Defendants' Objection to

Plaintiffs' Response to Motions for Summary Judgment contains arguments more properly

included in Defendants' Reply briefs than in Defendants' separately-filed Objection.  Further,

Defendants cite the Federal Rules of Evidence as a basis for striking statements in Plaintiffs'

response that are argument and not evidence to which the Federal Rules of Evidence apply.

IV.   Analysis

Defendants George and Krajca move for summary judgment on Plaintiffs' claims under

the Fourth and Fourteenth Amendments, and under state law.  The Court first considers summary

judgment with respect to Plaintiffs' Fourth and Fourteenth Amendment claims, which are

brought pursuant to 42 U.S.C. § 1983.

**A.     Plaintiffs' claims under § 1983**

To state a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate: (1) a violation of

the United States Constitution or of federal law; and (2) that the violation was committed by

someone acting under color of state law.  *See Attenberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252-53 (5th Cir. 2005).  In this case, Plaintiffs claim that Wichita County Jail nurses Krajca and George violated Henson's Fourth and Fourteenth Amendment rights by denying inmate Henson adequate medical care.  Nurse George and Nurse Krajca argue that Plaintiffs have failed to establish any constitutional violation and that, even assuming such a violation, they are entitled to qualified immunity.

The doctrine of qualified immunity protects government officials sued pursuant to § 1983 "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, ----U.S.----, 129 S.Ct. 808, 815 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  *Id.*  This doctrine protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Courts generally apply the two-pronged analysis established in *Saucier v. Katz*, 533 U.S. 194 (2001), in determining whether a government official is entitled to qualified immunity for an alleged constitutional violation.  The first prong of the *Saucier* analysis asks whether, taken in the light most favorable to plaintiff, the facts alleged show that the official's conduct violated a constitutional right.  *See Scott v. Harris*, 550 U.S. 372 (2007) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)).  Under *Saucier*, if, and only if, the Court finds a violation of a constitutional right, the Court then asks whether the right was clearly established in light of the specific context of

10

the case. *Id.* If there is evidence to support the violation of a constitutional right, the court asks whether, nevertheless, qualified immunity is appropriate because defendant's actions were objectively reasonable "in light of clearly established law at the time of the conduct in question." *Hampton Co. Nat'l Sur., L.L.C. v. Tunica County, Miss.,* 543 F.3d 221, 225 (5th Cir. 2008).

The Supreme Court has recently clarified that it is no longer mandatory for courts to consider the two prongs set out in *Saucier* in order, although the Court noted that it may be beneficial to do so. *Pearson,* 129 S.Ct. at 815. Under *Pearson*, courts are now permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Id.*

The usual summary judgment burden of proof is altered in the context of a defense of qualified immunity. *See Gates v. Texas Dep't of Protective and Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008). An official need only plead his or her good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law. *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005) (citing *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)). To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present "absolute proof," but must offer more than "mere allegations." *Ontiveros v. City of Rosenburg, Tex.,* No. 08-20081, 2009 WL 807450 at *2 (5th Cir. Mar. 20, 2009).

Nurse Krajca and Nurse George have pleaded the affirmative defense of qualified immunity. At the summary judgment stage, a determination of whether a constitutional right was violated overlaps substantially with the determination of whether the first prong of the qualified immunity analysis is satisfied. Accordingly, the Court first addresses whether

11

Plaintiffs have raised a genuine issue of material fact that Defendants have violated Henson's rights under the Fourth and Fourteenth Amendments, and then considers whether Defendants' actions were objectively unreasonable under the qualified immunity analysis.

**1.      Plaintiffs' Fourth Amendment Claim**

Defendants move for summary judgment on Plaintiffs' § 1983 claims under the Fourth Amendment, and argue that since Henson was a pretrial detainee at the time of the alleged constitutional violation, the Fourth Amendment is inapplicable.  Plaintiffs' response did not address summary judgment with respect to their Fourth Amendment claims.

A person's apprehension by the use of deadly force is subject to the Fourth Amendment's reasonableness requirement.  *Tennessee v. Garner*, 471 U.S. 1 (1985).  However, an arrestee's Fourth Amendment protections end when he becomes a pretrial detainee.  *See Valencia v. Wiggins*, 981 F. 2d 1440 (5th Cir. 1993) (pretrial detainee's excessive force claims not cognizable under Fourth Amendment during pre-trial detention and subsequent to initial arrest). Instead of the Fourth Amendment, a pretrial detainee's claims for denial of medical care are based in the Fourteenth Amendment.  *See Wagner v. Bay City, Tex.*, 227 F.3d 316, 324 (5th Cir. 2000) (denial of medical care claims flow from the procedural and substantive due process clause of the Fourteenth Amendment).

The Court finds that there is no issue of fact that Henson was a pretrial detainee at the time his constitutional rights were allegedly violated, and therefore summary judgment is appropriate with respect to Plaintiffs' Fourth Amendment claims.

Accordingly, Defendants' Motions for Summary Judgment with respect to Plaintiffs' § 1983 claims based on a violation of the Fourth Amendment should be and are hereby

GRANTED.

2.      **Plaintiffs' Fourteenth Amendment Claim**

Nurse Krajca and Nurse George also assert that they are entitled to summary judgment with respect to Plaintiffs' § 1983 claims based on violations of the Fourteenth Amendment.  The Fifth Circuit has recognized a pretrial detainee's Fourteenth Amendment right not to have his serious medical needs met with deliberate indifference by jail officials.[6]  *Hare v. City of Cornith, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996).  A prison official acts with deliberate indifference only if the official (A) knows that the inmate faces a substantial risk of serious bodily harm and (B) disregards that risk by failing to take reasonable measures to abate it.  *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  Mere negligence will not suffice, and deliberate indifference cannot be inferred from a failure to act reasonably.  *See Hare*, 74 F.3d at 649-50.  Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances.  *Id.; Gobert*, 364 F.3d at 347; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999).  Deliberate indifference requires a showing that officials refused to treat the detainee, ignored his complaints, intentionally treated him incorrectly, or engaged in similar conduct that would clearly evince a wanton disregard for any serious medical needs.  *Domino v. Tex. Dept. of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001).

      **a.  Plaintiffs' Fourteenth Amendment Claim against Nurse Krajca**

---

[6] Because Plaintiffs complain that jail personnel provided inadequate medical care, this case is an episodic act or omission claim, which requires Plaintiffs to show Defendants acted with deliberate indifference.  *See Hare*, 74 F.3d at 645.

The Court considers whether Plaintiffs have produced any evidence that Nurse Krajca was deliberately indifferent to Henson's serious medical needs.  The evidence shows that Nurse Krajca engaged in the following conduct relevant to Plaintiffs' claims: (1) On November 26, 2004, Nurse Krajca visited Henson at the annex; and (2) On November 27, 2004, Nurse Krajca authorized Henson's move to solitary.

### i.  Nurse Krajca's visit to the annex

The undisputed evidence shows that on November 26, 2004, Nurse Krajca was called to the annex because Henson was complaining about difficulty breathing.  Nurse Krajca was informed that Henson had COPD and pneumonia, and had recently been prescribed an antibiotic. Nurse Krajca gave Henson a breathing treatment, prescribed that the jail staff could give Henson breathing treatments every four hours, and filled out a pink card for Henson to see the physician at the next doctor's call.

There is a dispute in the evidence as to how long Nurse Krajca spent with Henson on November 26, 2004.  *See* Pl's App. at 29 (log indicating that Henson was at the nurses' station for ten minutes), 124 (where Krajca states she spent an hour and a half with Henson).  There is also a dispute as to whether Nurse Krajca took Henson's blood pressure and heart rate during her visit with Henson and, assuming so, whether Henson's vitals were within a normal range.  *See* Pl's App. at 3 (where Krajca avers she took Henson's vitals and they were normal), Pl's App. at 124 (where, at her deposition, Krajca is unable to state what a normal range for vitals would be for Henson or in general).

There is also a dispute as to whether Nurse Krajca violated General Order 30.03, entitled "Detention Center Health Services."  This order states, under the heading "Inmates Requiring

Medical Attention," in subsection c, that reasons to send a prisoner in the custody of a peace officer to the hospital include: "(1) Major bleeding that needs more than routine first aid, (2) Having difficulty in breathing, and (3) The individual complains of severe pain."  Pl's App. at 80.  Plaintiffs argue that Nurse George violated this general order by not sending Henson to the hospital when he complained of difficulty breathing.  Pl's Resp. at 5.

The evidence shows that, after Nurse Krajca visited with Henson around noon on November 26, 2004, she did not have any further dealings regarding Henson until November 27, 2004, when she was called regarding moving Henson to solitary.

### ii.     Authorization of Henson's Move to Solitary

The undisputed evidence shows that Henson was moved to medical segregation on November 27, 2004, and that prior to moving Henson, a detention officer called Nurse Krajca for authorization.  When the detention officer called, he told Nurse Krajca that he had already contacted Nurse George, who gave the detention officers permission to move Henson if he was observed every fifteen minutes.  Pl's App. at 10.  At her deposition, Nurse Krajca stated that although the detention officer did not mention smoking as a reason for moving Henson, she thought moving Henson would not hurt him because there was smoking in the jail, but not in medical solitary.  Krajca Sup. App. at 73-74.  Nurse Krajca told the detention officer Henson could be moved and observed every thirty minutes rather than every fifteen minutes.

Nurse Krajca also stated at her deposition that the detention officer did not tell her anything about Henson's physical condition when he called on November 27, 2004.  Krajca's Sup. App. at 85-86.  Specifically, Nurse Krajca stated that she was not told that Henson's blood pressure was 208 over 107, that he was sweating profusely, or that he had been given a breathing

treatment and was still having breathing problems.  *Id.*  Nurse Krajca stated that if she had been given such information, she would have gone to the jail to see Henson.  *Id.* at 86.

In contrast to this deposition testimony, statements from two detention officers indicate that Nurse Krajca was provided with information regarding Henson's condition when she authorized his move to solitary.  Detention officer Jason Shepherd averred that he took Henson's blood pressure around 11:05 p.m. on November 27, 2004, stating that "[w]hen a nurse tells us to take a blood pressure and pulse rate, we do it and report it directly to the nurse or to the supervisor, who reports it to the "on call nurse" if there is not a nurse at the facility."  Krajca's Sup. App. at 24-25.

Detention officer Parish's statements also indicate that Krajca was provided with information on Henson's condition.  Parish stated that Henson complained that he was having difficulty breathing at around 10:15 p.m on November 27, 2004, and was given a breathing treatment.  *Id.* at 21.  Parish further averred that at 10:30 p.m., Henson called the control room because he was still having breathing problems.  *Id.*  Parish stated that the downtown nurse (Nurse George) was advised of the situation and her response was to place Henson in medical solitary under a fifteen minute observation period.  *Id.*  Parish then stated that Nurse Krajca was given the same information that was given to Nurse George, and that Krajca advised the officers to move Henson to solitary for observation under a thirty minute period.  *Id.*  Parish further averred that Nurse Krajca also requested that Henson's vital signs be checked, and that Detention Officer Shepperd took Henson's vitals, reporting that Henson had a blood pressure of 208/107 and pulse rate of 92, and that he was sweating heavily.  *Id.* at 21-22.  Next, Parish averred that Nurse Krajca was given this information, and affirmed her decision for Henson to be

16

placed in medical solitary.[7]  *Id.* at 22.

### iii.    Evidence of Deliberate Indifference

The Court finds that this evidence presents a genuine issue of material fact regarding whether Nurse Krajca was deliberately indifferent to Henson's serious medical needs.  There are genuine issues of fact in dispute regarding whether Krajca was subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm to Henson existed, and that Nurse Krajca actually drew such an inference.  *Farmer v. Brennan*, 511 U.S. at 837.  It is not disputed that Krajca responded to whatever information she was given regarding Henson's condition by approving moving Henson to solitary under thirty minute observations, and that Krajca did not visit Henson personally, call the jail doctor, or direct that Henson be taken to a hospital on November 27, 2004.   Nurse Krajca's own testimony that she would have visited Henson had she known his blood pressure, that he was sweaty, and that he was having trouble breathing, suggests that someone in Henson's condition had serious medical needs and should have at least been seen by a nurse.  *See* Krajca's Sup. App. at 85-86.  Thus, to the extent Krajca was fully informed of Henson's condition, there is evidence that she was aware that such a condition warranted medical attention, and her decision to have detention officers move Henson to solitary rather than to involve anyone with any medical training in the situation raises a genuine issue of fact regarding whether Krajca exhibited wanton disregard for Henson's serious medical needs.  *Domino,* 239 F.3d at 756.  Accordingly, the Court finds that genuine issues of

---

[7] The Court notes that in her affidavit, Krajca averred that the jail officers stated that they took Henson's blood pressure and it was 208/107, and that, in her experience, breathing treatments of albuterol can temporarily result in higher readings on vitals.  It is unclear whether Krajca was averring that she knew of Henson's high blood pressure on November 27, 2004, but was not concerned due to his recent albuterol treatment, or is simply attempting to supply a reason after-the-fact for why Henson may have had high blood pressure when detention officer Shepherd took Henson's blood pressure.

material fact exist regarding whether Nurse Krajca was deliberately indifferent, preventing this Court from granting summary judgment on this ground.  The Court now considers whether, in spite of this factual dispute, Nurse Krajca is entitled to summary judgment on her defense of qualified immunity.

### b.      Qualified Immunity as to Nurse Krajca

Nurse Krajca claims that she is entitled to summary judgment because she is immune from suit under the doctrine of qualified immunity.  Krajca asserts she acted in good faith and was objectively reasonable under the circumstances of this case.  To avoid summary judgment, Plaintiffs must present evidence to raise a fact issue material to the resolution of the question of whether Nurse Krajca acted in an objectively reasonable manner in view of the existing law and facts available to her.  *See Lampkin v. City of Nacagdoches*, 7 F.3d 430, 435 (5th Cir. 1993).  If reasonable public officials could differ as to whether the defendant's actions were lawful, the defendant is entitled to immunity.  *See Malley*, 475 U.S. at 341 (1986).  "Even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity if the conduct was objectively reasonable."  *Zarnow v. City of Wichita Falls, Tex.*, 500 F.3d 401, 408 (5th Cir. 2007) (quoting *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990)).  However, the defense of qualified immunity is not available to the plainly incompetent or those who knowingly violate the law.  *Malley*, 475 U.S. at 341.

The Court finds that genuine issues of material fact exist regarding whether Nurse Kracja acted in an objectively reasonable manner in view of the facts available to her, precluding the Court from granting summary judgment on the ground of qualified immunity.  Plaintiffs have raised an issue regarding whether Nurse Krajca was aware of facts regarding Henson's

18

condition, including that Henson had a blood pressure of 208/107, was sweaty, and was having

trouble breathing even after receiving breathing treatments.  Krajca's Sup. App. at 24-25, 85-86.

In addition, Nurse Krajca testified that, had she known this information, she would have gone to

the jail to see Henson.  Krajca's Sup. App. at 85-86.   The Court finds, based on this evidence,

that Plaintiffs have raised a fact issue as to whether Nurse Krajca was objectively reasonable in

view of the facts known to Nurse Krajca at the time in question.[8]  *See Michalik*, 422 F.3d at 262.

Accordingly, the Court finds that Nurse Krajca's Motion for Summary Judgment should be and

is hereby **DENIED** as to Plaintiffs' claims under the Fourteenth Amendment.

### c.        Plaintiffs' Fourteenth Amendment Claim against Nurse George

The Court considers whether Plaintiffs have produced any evidence that Nurse George

was deliberately indifferent to Henson's serious medical needs.  The evidence shows that Nurse

George engaged in the following conduct relevant to Plaintiffs' claims: (1) On November 23,

2004, Nurse George evaluated Henson at book-in and gave him prescription medication; (2)

Nurse George put Henson on doctor's call on November 23, 2004 and again on November 24,

2004; and (3) On November 27, 2004, Nurse George's authorized Henson's move to solitary.

### i.  Prescriptions at Book-in

As noted above, at book-in, Nurse George came to see Henson in the front tank.  Henson

---

[8]  The Court notes that Plaintiffs have produced evidence in response to Defendant Callahan's
motion for summary judgment suggesting that Nurse Kracja would not send serious ill inmates to the
hospital because jail physician Dr. Bolin intimidated nurses, including Nurse Krajca, and discouraged
them from seeking emergency care.  There is also evidence that, absent nurse intimidation, Nurse Krajca
may have not sought emergency care because she is plainly incompetent in her professional capacity.  *See*
Pl's App. at 122-123 (where Krajca cannot give an answer regarding what a normal blood pressure range
would be); *see also* Doc. # 147 (investigative report indicating that Krajca was told that another inmate,
Jason Brown, had thrown up blood, was incoherent, and had various pre-existing medical conditions, and
that Krajca responded by giving Brown antacids and suppositories and moving him to medical solitary).

told her that he had COPD, emphysema, and pneumonia.  Pl's App. at 106.  Henson informed

Nurse George that he had recently been to the ER and had been given prescriptions for a "Z-pac"

antibiotic, prednisone, and an inhaler, but that he had not filled these prescriptions.  *Id.* at 105-

06.  Nurse George averred that, at book-in, Henson's vitals were normal, and he did not appear

short of breath.  George's App. at 3; *see also* George's Sup. App. at 41 (where George states

Henson was not in distress when she saw him).  Nurse George further averred that "[s]ince

Henson had valid verifiable prescriptions from the emergency room, and the doctor's standing

orders authorize antibiotics" she gave him Keflex, and an albuterol inhaler and scheduled him to

see Dr. Bolin at the next doctor's call.  George's App. at 3.

      Plaintiffs have produced evidence suggesting that Nurse George did not follow Wichita

County Jail standing orders in providing Henson with Keflex and an albuterol inhaler.  The

undisputed evidence shows that Nurse George was not permitted to prescribe medications

without a doctor's order.  Pl's App. at 113.  While Nurse George avers that Henson had a

"verifiable" prescription, there is evidence suggesting that Nurse George did not see the

prescription or otherwise take steps to actually verify the prescription.  *Id.* at 105-08.

Accordingly, there is evidence that Nurse George did not provide Henson with Keflex and an

inhaler pursuant to the E.R. doctor's prescription.  George's Sup. App. at 32; Pl's App. at 108.

This is supported by the fact that while the E.R. doctor had prescribed prednisone, a steroid,

there is no evidence that Nurse George dispensed prednisone or any other steroid to Henson.  *See*

Pl's App. at 69.  Accordingly, Nurse George violated Wichita County Jail policy unless she

provided Henson with prescriptions pursuant a jail standing order, which allowed for certain

prescription medicines to be dispensed to inmates presenting certain symptoms.  Pl's App. at 50-

52, 113.

Plaintiff has produced evidence demonstrating that there were no standing orders regarding COPD, pneumonia, or emphysema for the Wichita County jails. Pl's App. at 50-55, 107-08, 113-15. Dr. Bolin, the jail physician, stated at his deposition that there are no standing orders for the diagnosis of pneumonia, COPD, or emphysema because he would expect to be called if an inmate came in with those kind of problems. *Id.* at 115. Plaintiffs also argue that Nurse George violated General Order 30.03 by not sending Henson to the hospital when he complained of difficulty breathing. Pl's Resp. at 5.

Nurse George has presented evidence that, although there were no standing orders for the illnesses Henson said he had, she followed standing orders addressing Henson's stated symptoms. At her deposition, Nurse George stated that she prescribed Keflex pursuant to a standing order for "cold symptoms with congestion and signs of infection." George's Sup. App. at 44. Nurse George stated that, although the standing order didn't say anything about pneumonia, pneumonia is an infection. *Id.* at 44. Nurse George also stated that, while Henson complained of pneumonia, she "had no idea at that time that he definitely had pneumonia" but "knew that he complained of congestion and shortness of breath" so she followed her standing orders for that. *Id.* at 64. There is also evidence suggesting that Nurse George prescribed the albuterol inhaler pursuant to a standing order for asthma, which has symptoms of shortness of breath, and also based on her knowledge that on previous visits to the Wichita Jail Henson had an inhaler. Pl's App. at 110.1; George Sup. App. at 54-59.

      **ii.    Doctor's call**

21

The undisputed evidence shows that after Nurse George visited with Henson at book-in, Nurse George filled out a "pink card" to put Henson on the doctor call for the downtown jail, which was scheduled for the next morning. George's App. at 3. Nurse George suspected that Henson might be transferred to the annex and that, if he was transferred, he would miss the downtown jail's doctor call. George's Sup. App. at 35-36. Nurse George avers that she told Henson to be sure and put in another request to see the physician at the annex if he was transferred there before he saw the doctor. George's App. at 3. In addition, Nurse George stated that when she came into work on November 24, 2004, she saw that Henson had been transferred to the annex and called the nurse at the annex to make sure Henson was put on the next doctor's call. George's App. at 38. Nurse George stated that she believed the next doctor's call would have been held the following day, Thursday, November 25, 2004, which was also Thanksgiving Day. *Id.* at 40. Nurse George testified that the doctor had been seeing inmates on holidays and that she did not know that Dr. Bolin would not be holding doctor's call at the annex on November 25, 2004. *Id.* Nurse George did not work on November 25th and 26th because of the Thanksgiving holiday, and appears to have had no further dealings regarding Henson until November 27, 2004. *Id.* at 39.

### iii.    Authorization of Henson's Move to Solitary

As noted above, detention officers have averred that, prior to moving Henson to solitary on the evening of November 27, 2004, Nurse George was called and authorized the move. Nurse George stated that she does not remember receiving such a call, but that if she was called she would have authorized the move, provided Henson was monitored closely, because inmates were allowed to smoke, and that Henson smoked, but that he would not be allowed to do so in solitary.

George's App. at 4.   Nurse George testified that every time she puts someone in medical

segregation, she requests detention officers observe the inmate every fifteen minutes.   George's

Sup. App. at 70.  The evidence shows that there was an emergency call button in solitary by

which Henson could request assistance.  George's App. at 5.

Nurse George testified that if she had known on November 27, 2004 that Henson's blood

pressure was 208 over 107, that he was sweating profusely, and having shortness of breath after

taking breathing treatments, she would have come up to the annex to see Henson.  George Sup.

App. at 72.  Nurse George noted that she has never received a telephone call that stated

anybody's blood pressure was as high as Henson's was on November 27, 2004, and that she

would have gone to see Henson had she been informed of his high blood pressure.  *Id.*

Plaintiffs have produced evidence that when Nurse George was called on November 27,

2004, she was informed that Henson was having problems breathing even after receiving

breathing treatment and using his own inhaler.  Pl's App. at 19, 21.   However, unlike the

evidence with respect to Nurse Krajca, Plaintiff has not produced any evidence suggesting that

Nurse George was told that Henson was sweaty and had a blood pressure of 208 over 107.

Plaintiffs' evidence shows that detention officer Shepherd took Henson's vitals at Nurse Kracja's

request and that this information was reported back to Nurse Krajca, but does not raise a fact

issue as to whether Nurse George requested or was given this information.  *See* Pl's App. at 19-

26.

### iv.    No evidence of Deliberate Indifference

Having considered the evidence, the Court finds that Plaintiffs have failed to raise a

genuine issue of fact that Nurse George was deliberately indifferent to Henson's serious medical

needs.  The evidence shows that, at book-in, Nurse George evaluated Henson, listened to his complaints, put him on the doctor's call, and provided him with medications according to the symptoms he complained of.  While there is an issue regarding whether Nurse George followed jail policy in providing Henson with medication, the Court does not find any evidence of wanton disregard for any serious medical need George was aware of.  The Court notes that Nurse George has averred that Henson's vitals were normal and he did not appear short of breath, and that while Henson needed a doctor, there was no immediate need.  George's App. at 2-4.  While Nurse George may have been negligent in providing care to Henson, the Court does not find any evidence with respect to Nurse George's conduct at book-in raising an issue that Nurse George refused to treat Henson, ignored his complaints, intentionally treated him incorrectly, or engaged in similar conduct that would clearly evince a wanton disregard for any serious medical needs. *Domino,* 239 F.3d at 756.

In addition, while the evidence demonstrates that Henson was not seen by a doctor while at Wichita County Jail, the Court does not find this raises an issue regarding whether Nurse George was deliberately indifferent.  The undisputed evidence shows that Nurse George put Henson on the doctor's call for the downtown jail for November 24, 2003, told Henson that if he was transferred to the annex he should ask to be put on the doctor's call there, and upon finding Henson had been transferred, called Dawn Coleman at the annex to ensure Henson was put on the next doctor's call there.  Plaintiffs have not pointed to any evidence contradicting Nurse George's assertion that she believed the next doctor's call at the annex would be held on November 25, 2004.  It is nothing short of tragic that Henson did not see a doctor while at the Wichita County jail, but based on the evidence before the Court, the Court concludes that

24

Plaintiffs have failed to raise a genuine issue of fact that this should be attributed to the deliberate indifference of Nurse George.

Similarly, the Court does not find that Plaintiffs have raised an issue regarding whether Nurse George's conduct on November 27, 2004 constitutes deliberate indifferent to Henson's serious medical needs. Plaintiffs have not produced any evidence that detention officers viewed Henson's condition as requiring immediate attention and passed on such concerns to Nurse George when she was called on November 27, 2004. While Nurse George testified that if she had known Henson was having trouble breathing, was sweaty, and had a blood pressure of 208 over 107 she would have come down to the jail, unlike the evidence with respect to Nurse Krajca, there is no evidence that George was told Henson's blood pressure or that he was sweating profusely. Based on this evidence, the Court finds that Plaintiffs have failed to raise a genuine issue that Nurse George was deliberately indifferent to Henson's serious medical needs.

In addition, the Court finds that even assuming a fact issue, Nurse George would be entitled to qualified immunity as discussed below.

### d.      Qualified Immunity as to Nurse George

The Court finds that, even assuming a genuine issue of material fact with respect to Plaintiffs' claims against Nurse George under the Fourteenth Amendment, Nurse George is entitled to qualified immunity. To survive summary judgement, Plaintiffs would have to present evidence to raise a fact issue material to the resolution of the question of whether Nurse George acted in an objectively reasonable manner in view of the existing law and facts available to her. *See Lampkin v. City of Nacagdoches*, 7 F.3d 430, 435 (5th Cir. 1993). The Court finds Plaintiffs have failed to meet this burden.

25

The Court notes that there is no evidence calling into question Nurse George's statements that she did not think Henson was in distress at book-in, or suggesting that detention officers viewed Henson's condition as requiring immediate attention and passed on such concerns to Nurse George when they called her on November 27, 2004.  In addition, Nurse George has put forth evidence suggesting that she authorized Henson's move in the belief that he may benefit from a smoke-free environment, and also that detention officers would be able to monitor Henson's condition.  The Fifth Circuit has held that a defendant's acts are objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated a constitutional right.  *Cozzo v. Tangipahoa Parish Council-President Gov't*, 270 F.3d 273, 284 (5th Cir. 2002).  Here, Plaintiffs' own expert testified that he has no individual criticism of Nurse George's treatment of Henson.[9]  George's App. at 29. Based on this evidence, the Court finds that Plaintiffs have failed to produce evidence raising an issue as to whether Nurse George was objectively unreasonable, and that Nurse George is entitled to qualified immunity.

Accordingly, the Court finds that Nurse George's Motion for Summary Judgment should be and is hereby **GRANTED**.

**B.      Plaintiffs' State Law Claims**

Defendants move for summary judgment on Plaintiffs' claims under the Texas Survival Statute and Texas Wrongful Death Act.

The Court dismissed Plaintiffs' state law tort claims against Defendants Krajca and

_____

[9]  The Court notes that Plaintiffs' expert had no specific criticisms of Nurse Krajca.  *See* George's App. at 29.  However, the Court does not find that this opinion overcomes the fact issue presented by other evidence on record pertaining to Nurse Krajca.

George when it granted Defendant Wichita County's motion for judgment on the pleadings.

Accordingly, Nurse Krajca and Nurse George's Motions for Summary Judgment with respect to Plaintiffs' state law claims are hereby **DENIED** as moot.

V.      Conclusion

For the foregoing reasons, the Court finds that Defendant Krajca's Motion for Summary Judgment (Doc. # 112) should be and is hereby **GRANTED in part** and **DENIED in part**.  The Court finds that genuine issues of material fact exist regarding Plaintiffs' claims under the Fourteenth Amendment brought pursuant to 42 U.S.C. § 1983.   However, Plaintiffs' Fourth Amendment claims are hereby **DISMISSED** with prejudice.

In addition, the Court finds that Defendant George's Motion for Summary Judgment (Doc. # 113) should be and is hereby **GRANTED**.  All of Plaintiffs' claims against Michelle George are hereby **DISMISSED** with prejudice.

**SO ORDERED** this **4th** day of **August, 2009.**

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**