IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| ESTATE OF WILBERT LEE | § | |
| HENSON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 7:06-CV-44-O |
| | § | ECF |
| WICHITA COUNTY, TEXAS, et al., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are the following:

1. Defendant Bolin's Motion to Dismiss Based on Qualified Immunity (Doc. # 66), filed September 10, 2007;

2. Defendant Bolin's Brief in Support (Doc. # 67), filed September 10, 2007;

3. Plaintiffs' Response to Defendant Bolin's Motion to Dismiss (Doc. # 73), filed October 23, 2007;

4. Defendant Bolin's Amended Motion to Dismiss Based on Qualified Immunity and Motion for Summary Judgment (Doc. # 155), filed June 30, 2009;

5. Defendant Bolin's Appendix in Support of his Amended Motion to Dismiss Based on Qualified Immunity and Motion for Summary Judgment (Doc. # 155), filed June 30, 2009;

6. Plaintiffs' Brief in Response to Defendant Bolin's Amended Motion to Dismiss Based on Qualified Immunity and Motion for Summary Judgment (Doc. # 156), filed July 6, 2009; and

7. Plaintiffs' Appendix in Support of their Response to Defendant Bolin's Amended

Motion (Doc. # 157), filed July 6, 2009;

Having reviewed the relevant filings, the evidence, and the law applicable to the issues raised, the Court finds as follows:

I.      Background

Plaintiffs are the daughters of Wilbert Henson ("Henson"), who died while being detained at the Wichita County Jail.  Henson was arrested on November 23, 2004 on a bond forfeiture warrant for driving with a suspended license.  Henson was taken to Wichita County Jail, where Defendant Daniel Bolin ("Bolin" or "Dr. Bolin"), M.D., is a contract physician.

At book-in, Henson complained of trouble breathing.  Michelle George ("George"), a jail nurse, came to see Henson in the front tank.   Henson told her that he had Chronic Obstructive Pulmonary Disease ("COPD") and emphysema, and also stated that he had recently been to the emergency room, where he was told he had pneumonia.  Henson also informed Nurse George that at the emergency room, he was given prescriptions for a "Z-pac" antibiotic, prednisone, and an inhaler, but that he had not filled these prescriptions.  Nurse George gave Henson an antibiotic, Keflex, and also gave Henson an albuterol inhaler.  Nurse George also filled out a "pink card" requesting that Henson be put on the "doctor's call," which was scheduled to be held the next morning at the downtown jail.[1]

That night, sometime after his visit with Nurse George, Henson was transferred from the downtown jail to the another jail facility called "the annex."  Since Henson was on the doctor's call for the downtown jail, and not the annex, Henson did not see a doctor the morning after

---

[1] Pink cards are cards that could be filled out by inmates or nurses to request that an inmate receive medical attention.

book-in.  When George arrived at the downtown jail on Wednesday, November 24, 2004, she saw that Henson had been transferred to the annex.  George called the nurse at the annex and asked that Henson be placed on the next doctor's call at that facility.  Usually, the jail physician, Dr. Bolin, would have doctor's calls at the annex on Thursdays.  However, November 25, 2004 was Thanksgiving Day, and Dr. Bolin did not hold a doctor's call that day.

While at the annex, Henson complained to detention officers about his breathing, and other inmates noticed Henson having difficulty breathing and requested medical treatment on his behalf.  Around noon on November 26, 2004, another jail nurse, Kaye Krajca ("Krajca"), was called to the annex.  Henson informed Nurse Krajca that he had COPD and pneumonia, and had been to the hospital recently and had an antibiotic prescription.  Nurse Krajca filled out a pink card for Henson to see Dr. Bolin at the next doctor's call, and also gave Henson a breathing treatment.

In the evening on November 27, 2004, a detention officer called Nurse George and then Nurse Krajca regarding Henson.[2]  Nurse George was called first, and authorized moving Henson to a medical segregation cell (also known as "solitary" and the "doom room"), and asked that Henson be observed every fifteen minutes after being moved to solitary.[3]  Nurse Krajca was then contacted, authorized moving Henson to solitary, and asked that he be observed every thirty minutes.

Around 11:00 p.m. on November 27, 2004, Henson's vital signs were assessed, showing

_____

[2] As is discussed in the Court's Memorandum Opinion and Order resolving Michelle George and Kaye Krajca's Motions for Summary Judgment, it is not clear whether detention officers called the nurses because of Henson's breathing troubles or for some other reason.

[3] It is not clear whether the detention officers or Nurse George first suggested moving Henson to medical solitary.

a blood pressure reading of 208/107 and a heart rate of 92 beats per minute.[4]  It was also noted that Henson was sweating profusely at that time.  There is a dispute in the evidence as to whether Nurse Krajca was told this information.  *See* Memorandum Opinion and Order resolving Krajca and George's Motions for Summary Judgment.

After Nurse George and Krajca provided authorization, Henson was moved to a medical segregation cell.  The medical segregation cell was enclosed, and detention officers did not go into the cell to observe Henson, instead observing him through a small window in the cell door.  The detention officers kept an "inspection record" regarding their observations, marking down one of eighteen "codes" regarding what Henson was doing at a particular time.[5]

While in solitary, Henson was allowed breathing treatments every four hours.  The inspection records indicate that Henson received breathing treatments, administered by detention officers, at 2:15 a.m., 7:27 a.m., and 4:00 p.m. on November 28, 2004.  Henson received another breathing treatment at 3:25 a.m. on November 29, 2004.

At some point in the early morning hours on November 29, 2004, detention officers went to Henson's cell and found him in severe respiratory distress.  He was unable to walk or stand due to his severely deteriorated medical condition and shortness of breath.  Henson stated that he was "not going to make it."  As there was no nurse on duty, Nurse Ingram was called, and ordered that Henson be placed in a wheelchair and moved to a different room to administer a breathing treatment.  Henson's vital signs were again assessed, showing a blood pressure reading

---

[4]  It is unclear on the record before the Court whether Henson's vitals were taken before or after he was moved to a medical segregation cell.

[5]  For example, the officers marked "A" in the "remarks" section of the inspection record if Henson was awake, "S" if he was sleeping, and "D" if Henson was "at door."

of 231/151 and a heart rate of 53 beats per minute.  Jail detention officers attempted to administer the breathing treatment shortly after 5:00 a.m., but Henson was too weak to hold the hand-held breathing device, and became incoherent and lethargic.  A detention officer attempted unsuccessfully to hold the device near Henson's mouth in order to administer the medication. Henson told the detention officers "I'm done.  I'm not gonna [sic] make it."  Detention officers then began to massage Henson's shoulders and fan him with a tupperware lid, while trying to "motivate him to stay alive."  After a minute or two of struggling, Henson passed out, began "gurgling," and his eyes rolled back in his head.  Henson was rushed to the hospital where he died.  The Tarrant County Medical Examiner reported his cause of death as chronic obstructive pulmonary disease.

Plaintiffs filed this lawsuit on March 27, 2006, bringing claims arising out of Henson's death against Wichita County, Sheriff Thomas J. Callahan, Dr. Bolin, and jail nurses Krajca and George.[6]  Plaintiffs bring claims against Dr. Bolin pursuant to 42 U.S.C. § 1983 for violation of Henson's Fourth and Fourteenth Amendment rights, and also asserts claims under state law for negligence and breach of contract.  *See* Doc. # 41 (amended complaint).  Plaintiffs also seek damages under the Texas Survival Statute and Texas Wrongful Death Act, and ask for a declaratory judgment as to Defendant's liability.  *Id.*

On September 10, 2007, Dr. Bolin filed a motion to dismiss Plaintiffs' claims under 42 U.S.C. § 1983, arguing that dismissal was appropriate because Plaintiffs failed to produce evidence to support their claims.  *See* Doc. # 66, 67.  On October 23, 2007, Plaintiffs responded

---

[6]  Various detention officers and other jail employees were also sued, but were dismissed in their individual capacities from this action after a stipulation of dismissal, signed by the parties, was filed.

to Dr. Bolin's motion, submitting an appendix of evidence and asking the Court to consider the evidence in support of their claims.  Doc. # 73.  On August 7, 2008, the Court entered a Memorandum Opinion and Order resolving Dr. Bolin's Motion to Dismiss, finding that the evidence failed to support deliberate indifference on the part of Dr. Bolin, and dismissing Bolin from the case.  *See* Doc. # 93.

On June 2, 2009, the Court vacated its order resolving Dr. Bolin's motion to dismiss. Doc. # 154.  The Court noted that it improperly considered matters outside of the pleadings in resolving the motion, and also dismissed Dr. Bolin from this suit without addressing Plaintiffs' state law claims.  *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999) (in reviewing a Rule 12(b)(6) motion, a court cannot look beyond the pleadings); *see also* FED. R. CIV. P. 12(b), (d).  In addition, because both parties asked the Court to consider matters outside of the pleadings in resolving Dr. Bolin's Motion to Dismiss, the Court found it appropriate to treat Dr. Bolin's motion to dismiss as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  *See* FED. R. CIV. P. 12(b), (d); FED. R. CIV. P 56; Doc. # 66, Doc. # 67 at 3 (improperly stating that a defendant can meet his burden under 12(b)(6) by pointing to the absence of evidence to support Plaintiffs' claims, and citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), which involved a motion for summary judgment under Rule 56), 10 (arguing that Plaintiffs may have alleged the proper standard of care, but have failed to produce any evidence in support), 11 (where Bolin argues that Plaintiffs' evidence is not legally sufficient); Doc. # 73 at 1-14 (citing evidence),1-37 (attaching evidence not part of any pleading); Doc. # 154.  The Court provided notice to the parties that Dr. Bolin's motion would be considered one for summary judgment, and let the parties submit additional evidence and argument in support of

6

their relative positions. *See* Doc. # 154; FED. R. CIV. P. 12(d) (providing that where a court treats a motion to dismiss as one for summary judgment, all parties must be given a reasonable opportunity to present all the material that is pertinent to the motion).

On June 30, 2009, Dr. Bolin filed his Amended Motion to Dismiss Based on Qualified Immunity and Motion for Summary Judgment and Brief in Support. Doc. # 155. In his amended motion, Dr. Bolin asks for summary judgment with respect to Plaintiffs' state law claims, in addition to Plaintiffs' claims under § 1983. *See* Doc. # 155. On July 6, 2009, Plaintiffs filed a response and appendix in support. *See* Doc. # 156, 157.

The issues have been briefed and Dr. Bolin's motion is ripe for determination.

II.   Legal Standards

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* The movant makes a showing that there is no genuine issue of material fact by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(c).

Once the movant makes this showing, the non-movant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323-24. To carry this burden, the "opponent must do more

than simply show. . . some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  Instead, the non-movant must show that the evidence is sufficient to support a resolution of the factual issue in his favor.  *Anderson*, 477 U.S. at 249.  Neither conclusory allegations nor unsubstantiated assertions will satisfy the non-movant's summary judgment burden.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).  The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim.  *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  Summary judgment in favor of the defendant is proper if, after adequate time for discovery, the plaintiff fails to establish the existence of an element essential to his case and to which he will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322-23.

When weighing the evidence on a motion for summary judgment, the Court must decide all reasonable doubts and inferences in the light most favorable to the non-movant.  *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988).  The Court cannot make a credibility determination in light of conflicting evidence or competing inferences.  *Anderson*, 477 U.S. at 255.  As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied.  *Id.* at 250.

III.   Analysis

Dr. Bolin moves for summary judgment with respect to all of Plaintiffs' claims.  The Court first considers whether summary judgment is appropriate with respect to Plaintiffs' claims

under 42 U.S.C. § 1983.

## A.      Plaintiffs' claims under § 1983

To state a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate: (1) a violation of the United States Constitution or of federal law; and (2) that the violation was committed by someone acting under color of state law.  *See Attenberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252-53 (5th Cir. 2005).  In this case, Plaintiffs claim that Dr. Bolin, Wichita County jail physician, violated Henson's Fourth and Fourteenth Amendment rights by denying inmate Henson adequate medical care.  Dr. Bolin argues that Plaintiffs have failed to establish any constitutional violation and that, even assuming such a violation, he is entitled to qualified immunity.

The doctrine of qualified immunity protects government officials sued pursuant to § 1983 "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, ___U.S.___, 129 S.Ct. 808, 815 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  *Id.*  This doctrine protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Courts generally apply the two-pronged analysis established in *Saucier v. Katz*, 533 U.S. 194 (2001), in determining whether a government official is entitled to qualified immunity for an alleged constitutional violation.  The first prong of the *Saucier* analysis asks whether, taken in

the light most favorable to plaintiff, the facts alleged show that the official's conduct violated a constitutional right. *See Scott v. Harris*, 550 U.S. 372 (2007) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)).  Under *Saucier*, if, and only if, the Court finds a violation of a constitutional right, the Court then asks whether the right was clearly established in light of the specific context of the case. *Id.*  If there is evidence to support the violation of a constitutional right, the court asks whether, nevertheless, qualified immunity is appropriate because defendant's actions were objectively reasonable "in light of clearly established law at the time of the conduct in question." *Hampton Co. Nat'l Sur., L.L.C. v. Tunica County, Miss.,* 543 F.3d 221, 225 (5th Cir. 2008).

The Supreme Court has recently clarified that it is no longer mandatory for courts to consider the two prongs set out in *Saucier* in order, although the Court noted that it may be beneficial to do so. *Pearson,* 129 S.Ct. at 815.  Under *Pearson*, courts are now permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Id.*

The usual summary judgment burden of proof is altered in the context of a defense of qualified immunity. *See Gates v. Tex. Dep't of Protective and Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008).  An official need only plead his or her good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law. *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005) (citing *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)).  To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present "absolute proof," but must offer more than "mere allegations." *Ontiveros v. City of Rosenburg, Tex.,* No. 08-20081, 2009 WL 807450 at *2 (5th Cir. Mar. 20, 2009).

Dr. Bolin has pleaded the affirmative defense of qualified immunity.  At the summary judgment stage, a determination of whether a constitutional right was violated overlaps substantially with the determination of whether the first prong of the qualified immunity analysis is satisfied.  Accordingly, the Court first addresses whether Plaintiffs have alleged and raised a genuine issue of material fact that Defendant has violated Henson's rights under the Fourth and Fourteenth Amendments, and then considers whether Defendant's actions were objectively unreasonable under the qualified immunity analysis.

1.      **Plaintiffs' Fourth Amendment Claim**

Defendant Bolin moves for summary judgment on Plaintiffs' § 1983 claims, including their claims under the Fourth Amendment.

A person's apprehension by the use of deadly force is subject to the Fourth Amendment's reasonableness requirement.  *Tennessee v. Garner*, 471 U.S. 1 (1985).  However, an arrestee's Fourth Amendment protections end when he becomes a pretrial detainee.  *See Valencia v. Wiggins*, 981 F. 2d 1440 (5th Cir. 1993) (pretrial detainee's excessive force claims not cognizable under Fourth Amendment during pre-trial detention and subsequent to initial arrest). Instead of the Fourth Amendment, a pretrial detainee's claims for denial of medical care are based in the Fourteenth Amendment.  *See Wagner v. Bay City, Tex.*, 227 F.3d 316, 324 (5th Cir. 2000) (denial of medical care claims flow from the procedural and substantive due process clause of the Fourteenth Amendment).

The Court finds that there is no issue of fact that Henson was a pretrial detainee at the time his constitutional rights were allegedly violated, and therefore summary judgment is appropriate with respect to Plaintiffs' Fourth Amendment claims.

Accordingly, Defendant's Motion for Summary Judgment with respect to Plaintiffs' § 1983 claims based on a violation of the Fourth Amendment should be and is hereby **GRANTED.**

**2.      Plaintiffs' Fourteenth Amendment Claim**

Defendant Bolin also asserts that he is entitled to summary judgment with respect to Plaintiffs' § 1983 claims based on violations of the Fourteenth Amendment. The Fifth Circuit has recognized a pretrial detainee's Fourteenth Amendment right not to have his serious medical needs met with deliberate indifference by jail officials.[7] *Hare v. City of Cornith, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996). A prison official acts with deliberate indifference only if the official (A) knows that the inmate faces a substantial risk of serious bodily harm and (B) disregards that risk by failing to take reasonable measures to abate it. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Mere negligence will not suffice, and deliberate indifference cannot be inferred from a failure to act reasonably. *See Hare*, 74 F.3d at 649-50. Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances. *Id.; Gobert*, 364 F.3d at 347; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999). Deliberate indifference requires a showing that officials refused to treat the detainee, ignored his complaints, intentionally treated him incorrectly, or engaged in similar conduct that would clearly evince a wanton disregard for any serious medical needs. *Domino v. Tex. Dept. of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001).

**a.      Denial of Medical Care**

---

[7] Because Plaintiffs complain that jail personnel provided inadequate medical care, this case is an episodic act or omission claim, which requires Plaintiffs to show Defendants acted with deliberate indifference. *See Hare*, 74 F.3d at 645.

Plaintiffs allege that Dr. Bolin violated Henson's Fourteenth Amendment rights because, among other things, Bolin was made aware of Henson's serious medical needs and was deliberately indifferent to those needs and withheld his services.  In support of this allegation, Plaintiffs note that several jail nurses filled out pink cards requesting that Henson be seen by a jail physician.  Doc. # 64 at 4-5, 9.  However, the Court finds such evidence is insufficient to raise any genuine issue of material fact regarding whether Bolin was aware of inmate Henson's medical needs during his visit to the Wichita County jail.  Plaintiffs concede that Bolin did not visit the jail during Henson's incarceration, and there is no evidence that anyone called Dr. Bolin or otherwise alerted him that Henson was present at the jail and had serious medical needs. *See* Doc. # 73 at 13.  Accordingly, the Court finds that the fact that nurses submitted pink cards requesting that Henson see a jail physician fails to raise genuine issues of material facts regarding whether Bolin knew of and disregarded a substantial risk of serious harm to Henson. *See Farmer*, 511 U.S. at 837.

Even though there is no evidence that Bolin interacted directly with Henson or knew that Henson was in need of medical attention, Plaintiffs also allege that Bolin should be held liable for his actions and omissions as a supervisor at the Wichita County jails.  Accordingly, the Court now considers whether Plaintiffs have produced evidence raising a genuine issue of fact regarding supervisory liability.

**b.**     **Supervisory liability**

Plaintiffs allege that Bolin was responsible for training and supervision of jail nurses and detention officers, but that Bolin failed to provide adequate training and supervision.  Doc. # 41 at 14.  Plaintiffs also allege that, per a contract between the County and Dr. Bolin, Bolin was to

develop and assist in establishing standing orders and procedures to handle acute and/or

emergency situations, but that Bolin failed to do so.  Doc. # 63 at 6-7.  Instead of supervising and

developing proper procedures, Plaintiffs allege that Bolin created, through fear and intimidation,

a well-known policy and custom among the nurses of the Wichita County Sheriff's Department

not to send inmates with serious medical conditions to the hospital.  Doc. # 41 at 22.  Plaintiffs

allege that these actions and omissions were taken with deliberate indifference and caused a

violation of Henson's rights under the Fourteenth Amendment.  *Id.*

Supervisory liability may exist without an official's overt personal participation in the

direct offensive act in certain circumstances.  Such circumstances include situations where

officials implement, adopt, or maintain a custom or policy that is so deficient that the policy

itself is a repudiation of constitutional rights and is the moving force of a constitutional

violation.  *See Cozzo v. Tangipahoa Parish Council-President Gov't*, 279 F.3d 273, 289 (5th Cir.

2002).  An official policy is:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and
promulgated by [the government entity] ... or by an official to whom the [entity] ha[s] delegated
policy-making authority; or

2. A persistent, widespread practice of ... officials or employees, which , although not
authorized by officially adopted and promulgated policy, is so common and well settled as to
constitute a custom that fairly represent [the entity's] policy.

*Id*. (citing *Johnson v. Moore,* 958 F.2d 92, 94 (5th Cir. 1992)).  A plaintiff may also establish a

custom or policy based on an isolated decision made in the context of a particular situation if the

decision was made by an authorized policymaker in whom final authority rested regarding the

action ordered.  *Id.; City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-25 (1988); *Bennett v.

Pippin,* 74 F.3d 578, 586 (5th Cir. 1996).

14

A supervisor may also be held liable under § 1983 for failure to properly supervise and train subordinate officers who cause a deprivation of constitutional rights.  *Wever v. Lincoln County*, 388 F.3d 601, 606-07 (8th Cir. 2004).  The plaintiff must show that (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.  *Id.* at 911-12 (citing *Hinshaw v. Doffer*, 785 F.2d 1260, 1263 (5th Cir. 1986)).  "[T]he misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor."  *Southard v. Tex. Bd. Of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997).  Only the direct act or omission of the supervisory official will give rise to individual liability under § 1983; a supervisor may not be held individually liable under a theory of *respondeat superior.  Coleman v. Houston Indep. Sch. Dist.,* 113 F.3d 528, 534 (5th Cir. 1997).

The Court first considers whether Plaintiffs have produced evidence raising a genuine issue of fact regarding whether Bolin was a supervisor at the Wichita County jails.

### i.      Bolin's role as supervisor

As an initial matter, the Court finds it necessary to address whether Plaintiffs have produced any evidence that Defendant Bolin was a supervisor at the Wichita County jails. Plaintiffs have produced Bolin's deposition testimony acknowledging that his contract with the County states that he will supervise the professional activities of the jail nursing staff.  Doc. # 157 at 18.  Bolin testified that he supervises jail nurses with respect to medical occurrences that he has knowledge of when he is at the jail, including sick calls, or if the nurses call him on the telephone.  *Id.* at 23-24.  In addition, Sheriff Callahan testified that the jail nurses worked under

the supervision of Dr. Bolin in their professional capacities in 2004.  *Id.* at 43.  Sheriff Callahan testified that if Dr. Bolin was not supervising the nurses in their professional activities, then there was no one at the jail supervising the nurses in their professional activities.  *Id.* at 44.

The Court finds that this evidence raises a genuine issue of material fact regarding whether Dr. Bolin is a supervisor that can be held liable under 42 U.S.C. § 1983.  While Dr. Bolin testified that he is not a supervisor to jail nurses or other employees, noting that he does not hire and fire jail nurses, the Court must decide all reasonable doubts and inferences in the light most favorable to the non-movant.  *Id.* at 24; *See also Walker*, 853 F.2d at 358.  Thus, the Court concludes that Plaintiffs have produced evidence raising a genuine issue of fact that Bolin is a supervisory official who, under appropriate circumstances, may be held liable under a supervisory theory.

### ii.      Policy or Custom

Plaintiffs allege that Dr. Bolin intimidated nurses and discouraged nurses from seeking emergency care for inmates.  In support of this, Plaintiffs have produced evidence including: (1) affidavits of former jail nurses Pathena Dawn Tweed and Dawn Marie Wilkinson, (2) Sheriff Callahan's deposition testimony, and (3) evidence relating to the death of former jail inmate Jason Brown.

### Affidavits of Former Jail Nurses

Plaintiffs have submitted affidavits from former jail nurses Pathena Dawn Tweed and Dawn Marie Wilkinson.  *See* Doc. # 157 at 72-79.   Both nurses averred that they have personally observed Dr. Bolin berate jail nurses who called him for medical instruction or direction, and that Dr. Bolin's demeanor intimidated the nurses working under him.  *Id.*  Both

nurses further averred that they personally feared calling Bolin for fear of unwarranted criticism.

Ms. Tweed and Ms. Wilkinson further averred that they and other members of the nursing staff perceived that Dr. Bolin did not want inmates being sent to the emergency room because it would be Dr. Bolin's responsibility to then go to the hospital to provide care for the inmate. *Id.* Wilkinson stated that she personally experienced this when a female inmate complained of abdominal pains, and reported that she had been raped prior to being arrested and detained. Wilkinson stated that she inspected the inmate, and discovered that the inmate had a tampon lodged deep into her body that neither she nor the inmate could remove. Wilkinson further averred that she recognized the situation required immediate medical attention, so she called Dr. Bolin for medical instruction, but was advised not to send the inmate to the emergency room and to remove the tampon herself. Wilkinson stated that she disobeyed Dr. Bolin's instruction, calling an ambulance and driving her own vehicle to the hospital to be with the inmate.

Ms. Tweed averred to a similar situation involving an inmate with very low blood sugar. Tweed stated that she called Dr. Bolin for instruction regarding the inmate and that Dr. Bolin informed her not to send the inmate to the emergency room "under any circumstances," advising Ms. Tweed to take whatever action she believed necessary to bring the inmates blood sugar levels up. Tweed stated that after several failed attempts to raise the inmate's blood sugar level, she had the inmate transported to the hospital for emergency treatment. Tweed stated that, upon learning of her decision to send the inmate to the emergency room, Dr. Bolin became very irate, yelled at Ms. Tweed, and questioned why she had defied his orders.

Ms. Tweed and Ms. Wilkinson both averred that they spoke with Sheriff Callahan about Dr. Bolin's treatment of them and other nurses, but that they were advised something to the effect that "this is just the way he (Bolin) is" and were instructed to ignore Bolin's behavior.

**Callahan's Testimony**

Plaintiffs have produced Defendant Callahan's deposition testimony, including testimony in which he acknowledges that he received complaints regarding Bolin's treatment of employees at the jail.  Doc. # 157 at 48.  Specifically, Callahan testified that he heard that Bolin gripes all the time at employees, including the nurses, about everything.  *Id.*  Callahan stated that he had been told that Bolin is grumpy when he is awakened in the middle of the night, and that Bolin doesn't like to be bothered.  *Id.*  Callahan testified that this is a common reputation that Bolin has among nurses.  *Id.*  Callahan further testified that nurses were told to ignore this, and to call Bolin any time that they need to.  *Id.*  Callahan stated that he has spoken with Bolin about this two or three times over the past ten to twelve years, and that Callahan told Bolin to "sweeten up" and "get a little nicer."  *Id.*

**Inmate Brown's death**

Plaintiffs have also produced evidence regarding the death of inmate Jason Brown.  This evidence, viewed in the light most favorable to Plaintiffs, indicates that Jason Brown was arrested on a drug charge and brought to the Wichita County jail on July 22, 2004, approximately four months before Henson was detained at the Wichita County jail.  Doc. # 146 at 689.[8]  En route to the jail, Brown began crying and pleaded with the arresting officer to release

_____

[8]  Doc. # 146 is a Reply brief with appendix submitted by Defendant Callahan in connection with his motion for summary judgment.  Though not submitted in connection with Dr. Bolin's motion for summary judgment, the Court considers the full record before the Court including the pleadings, depositions, answers to interrogatories, admissions, and affidavits on file, in resolving summary

him because he had medical problems and did not have long to live.  *Id.* 694-95.  The arresting

officer advised the jail staff upon arrival at the jail of Brown's medical problems.  *Id.* at 692.

After intake procedures were completed, Brown was put in the general inmate population.  *Id.* at

689.

Around 11:42 p.m. on July 23, 2004, someone in the general population tank pushed the

emergency button and notified the control room that an inmate had thrown up blood.  Doc. # 157

at 81.  Detention officer Dickey Lee Sours, Jr. responded to the call, and found Brown laying on

his side next to a puddle of blood 1 to 1.5 feet in width and 2 to 2.5 feet in length, with chunks of

food in the puddle.  *Id.*  Nurse Krajca was called, and over the phone, Krajca asked the detention

officers to give Brown some liquid antacids.  *Id.*

Later, Brown complained that he was in pain and begged for help.  Doc. # 157 at 81.

Krajca was again called, and asked "did anyone actually see him (Brown) throw up the blood?"

*Id*.  Sours responded, "Kaye (Krajca), I had to clean it up."  *Id.*  Krajca advised that Brown

should be given suppositories, but Brown would not take them.  *Id.*  Krajca was called again and

told that Brown was not coherent.  *Id.*  Krajca then went to the jail to visit Brown.  *Id.*

There is a dispute in the evidence regarding what happened next.  Nurse Krajca's notes,

produced by Plaintiffs, and evidence submitted by Defendant Callahan, indicate that Brown told

Nurse Krajca he had nausea and vomiting, and also informed her that he had several medical

problems including Auto Immune Chronic Hepatitis A, B, and C, Esophageal Varices, Jaundice,

Spleenial Magaly, and anemia.  Doc. # 146 at 691; Doc. # 157 at 83.  However, a memorandum

drafted by detention officer Sours and produced by Plaintiffs indicates that when Krajca arrived,

---

judgment.  Fed. R. Civ. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988).

she couldn't get Brown to respond.  Doc. # 157 at 81.

There is no dispute that Krajca then had Brown moved to medical solitary, and gave Brown suppositories.  *Id.*  Later, during a cigarette break, Nurse Krajca asked Sours "[d]o you know what kind of ass chewing I would get from Dr. Bolin if I sent him (Brown) to the hospital in the good health that he is in?"  *Id.* at 82.

Jason Brown died from a massive gastrointestinal hemmorage at the age of 26.  Doc. # 146 at 715.  It is difficult for the Court to determine when inmate Brown died because various Wichita County documents identify different dates of death.  The custodial death report indicates that Jason Brown died at 12:15 a.m. on July 24, 2004.  *Id.*  The investigator's report states that Brown's death occurred at 12:15 a.m. on August 25, 2004, although the report itself is dated August 20, 2004.  *Id.* at 689.  However, the report also states that Nurse Krajca told investigators she was called at 11:30 p.m. on July 24, 2004 and was told Brown was pulseless, suggesting 12:15 a.m. on July 25, 2004 was when inmate Brown was pronounced dead.  *See id.* at 691.

Plaintiffs have produced evidence that, after Brown's death, Dr. Bolin did not speak with Krajca about the medical care she provided to Brown, even though he does not agree with the actions she took.  Plaintiffs have produced Dr. Bolin's testimony that Nurse Krajca should have called him or transported Brown to the emergency room, rather than moving Brown to medical solitary, but that he did not speak to Nurse Krajca about her failure to call him, her failure to send Brown to the emergency room, or her use of medical segregation.[9]  *Id.* at 19.  Dr. Bolin

---

[9]  There is undisputed evidence that Dr. Bolin was not in town on the night Brown died.  Doc. # 146 at 287.  The Court does not find that this evidence demonstrates that Bolin and his alleged nurse intimidation custom did not play a role in Krajca's decision not to send Brown to the hospital, particularly in light of the evidence suggesting that Krajca made statements to detention officer Sours on the night of Brown's death indicating that she was worried Bolin would have been upset if she had sent Brown to the hospital.  It is not clear on the record before the Court whether Krajca was aware Bolin was out of town,

testified that the first time he learned about the events pertaining to Jason Brown's death was when he was served with the lawsuit.  Doc. # 157 at 29.

**Moving Force**

The Court finds, deciding all reasonable doubts and inferences in the light most favorable to Plaintiffs, that the evidence, including affidavits from former nurses, Callahan's deposition testimony, and evidence regarding the death of Jason Brown, demonstrates that there are genuine issues of material fact regarding whether Defendant Bolin is an official who can be held personally liable for implementing, adopting, or maintaining a custom or policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind the constitutional violation at issue here.  *See Cozzo*, 279 F.3d at 289.  Plaintiffs have produced evidence raising issues of fact regarding whether Dr. Bolin intimidated nurses and discouraged nurses from seeking emergency care for inmates.  In addition, Plaintiffs have produced evidence suggesting that, due to Bolin's opposition to seeking emergency care for inmates, jail nurses on a number of occasions had to disobey Dr. Bolin's direct orders in order to provide care for inmates with serious medical needs.  *See* Doc. # 157 at 72-79.  The evidence suggests that, in other situations, Dr. Bolin's opposition to seeking emergency care resulted in nurses, specifically Nurse Krajca, not calling Dr. Bolin or transporting sick inmates to the hospital.  *See Id.* at 81.  Further, the evidence raises an issue as to whether Henson needed emergency attention, and whether Nurse Krajca was aware of this, but did not call Dr. Bolin or send Henson to the hospital.  *See* Doc. 157; *see also* Memorandum Opinion and Order resolving Nurse Krajca's motion for summary judgment.  The Court finds that this evidence raises genuine issues of

---

or what procedures may have been in place in light of his absence.

material fact regarding whether a policy of nurse intimidation was a moving force behind violation of Henson's constitutional rights, indicating that summary judgment is inappropriate.

### iii.    Failure to Train or Supervise

Plaintiffs also allege that Bolin was responsible for training and supervision of jail nurses and detention officers, but that Bolin failed to provide adequate training and supervision.  Doc. # 41 at 14.  The Court finds that, based on the evidence as discussed above, Plaintiffs have raised genuine issues of fact regarding whether Bolin failed to supervise Wichita County jail nurses. There is evidence suggesting that Bolin served as a supervisor, and in this role, intimidated nurses and discouraged them from seeking medical care for seriously ill inmates.  In addition, the evidence suggests that Bolin only supervised nurses when he was physically present at the jail or was called, even though Bolin's contract with the County stated that he would be supervising the nurses' professional activities.  The Court finds this evidence raises genuine issues of fact regarding whether Bolin failed to supervise jail nurses.

In addition, the Court finds that Plaintiffs have produced evidence raising genuine issues of material fact regarding whether there is a causal link between Bolin's failures as a supervisor and violation of Henson's rights.  As noted above, there is evidence suggesting that Bolin was a supervisor to jail nurses, but only performed such duties when he was physically present at the jail or was called on the phone, leaving jail nurses unsupervised for much of their time at the jail. There is no dispute that Bolin was not present at the jail or called by nurses regarding Henson at any time during Henson's incarceration.  In addition, there is evidence suggesting that Dr. Bolin's opposition to nurses seeking emergency care for sick inmates resulted in nurses, specifically Nurse Krajca, not calling Dr. Bolin or transporting sick inmates, including Henson,

to the hospital.  *See* Doc. # 157 at 81.  Accordingly, the Court finds that there is an issue of fact

regarding whether there is a causal link between Bolin's failure to train and violation of

Henson's constitutional right to medical care.

Further, the Court finds that there is evidence raising a genuine issue of material fact

regarding whether Bolin's failure to supervise amounts to deliberate indifference.  For an official

to act with deliberate indifference, the official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and must also draw the

inference.  *Smith,* 158 F.3d at 911.  Deliberate indifference can be inferred from the fact that the

risk of harm is obvious.  *Hope v. Palzer*, 536 U.S. 730 (2002).  Here, the Court has found

genuine issues of fact regarding whether Dr. Bolin, as supervisor of the jail nurses, had a policy

or custom of intimidating nurses and discouraging them from seeking medical treatment for

inmates with serious medical needs.  To the extent Bolin implemented such a custom, the Court

finds that the obviousness of the risk of harm from such a custom is sufficient to raise a fact issue

regarding whether Bolin was aware of facts from which the inference could be drawn that his

failure to supervise jail nurses posed a substantial risk of serious harm to inmates.  In addition,

the obviousness of the risk of harm also creates a genuine fact issue regarding whether

Defendant Bolin in fact drew the inference that his failure to supervise would cause harm.  *See*

*Smith*, 158 F.3d at 912; *Farmer*, 511 U.S. at 842 (stating that a fact-finder may conclude that a

prison official knew of a substantial risk from the very fact that the risk was obvious).  The Court

finds that this evidence raises genuine issues of material fact regarding whether Defendant

Bolin's failure to supervise demonstrates wanton disregard to the constitutional rights of inmates

at the Wichita County jail, rising to the level of deliberate indifference.[10]

c.      **Qualified Immunity**

Dr. Bolin has raised the defense of qualified immunity, and moves for summary judgment on this ground.  As an initial matter, the Court notes that Dr. Bolin is entitled to assert the defense of qualified immunity even though he is a contract physician.  *West v. Atkins*, 487 U.S. 42, 56 (1988); *Chauncey v. Evans*, No. 2:01-CV-0445, 2003 WL 21730580, at *2 (N.D. Tex. Feb. 11, 2003).

In order to overcome the defense of qualified immunity, Plaintiffs must prove Dr. Bolin violated "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Gibson v. Rich*, 44 F.3d 274 (5th Cir. 1995).  If reasonable public officials could differ as to whether Bolin's actions were lawful, Bolin is entitled to immunity.  *See Malley*, 475 U.S. at 341 (1986).  "Even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity if the conduct was objectively reasonable."  *Zarnow v. City of Wichita Falls, Tex.*, 500 F.3d 401, 408 (5th Cir. 2007) (quoting *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990)).  In addition, the Court must also consider whether Plaintiffs have raised an issue of fact regarding whether the defense of qualified immunity is unavailable because the defendant is plainly incompetent or

---

[10] Plaintiffs allege that Bolin failed to properly train the jail nurses.  The Court finds that Plaintiffs have produced insufficient evidence regarding whether Bolin failed to adequately train nurses.  In addition, the Court finds that Plaintiffs have failed to raise a genuine issue of material fact regarding whether Bolin failed to train or supervise detention officers.  Plaintiffs point to the fact that medically trained personnel are not at the jail twenty-four hours a day, seven days a week, but the Court finds, assuming the truth of this assertion, there is no requirement that the jail provide medically-trained personnel around the clock, particularly where the jail has in place an "on-call" system, and that Plaintiffs have failed to produce evidence raising an issue as to whether any under-staffing was causally linked to Plaintiffs' harm in this case.

knowingly violated the law.  *See Malley*, 475 U.S. at 341.

The Court finds that genuine issues of material fact exist regarding whether Defendant Bolin acted in an objectively reasonable manner in view of the clearly established law at the time of the conduct in question, in light of the facts available to him, precluding the Court from granting summary judgment on the grounds of qualified immunity.  Plaintiffs have produced evidence raising genuine issues of material fact regarding whether Dr. Bolin was a supervisor of the Wichita County jail nurses, and regarding whether, in this role, Dr. Bolin intimidated nurses and discouraged nurses from seeking emergency care for inmates with serious medical needs.  In addition, to the extent there was such a policy, it is obvious that the policy would result in inmates with serious medical needs not receiving medical attention and that harm would likely result.  Accordingly, the Court finds, based on the evidence before it, that Plaintiffs have raised a fact issue as to whether Bolin was objectively reasonable in view of the facts known to him and in light of clearly established law at the time in question.[11]

Accordingly, the Court finds that factual issues exist precluding the Court from granting summary judgment on the ground of qualified immunity, and Defendant Bolin's Motion for Summary Judgment is hereby **DENIED** as to Plaintiffs' claims under the Fourteenth Amendment.

**B.**     **State Law Claims**

Dr. Bolin also moves for summary judgment as to Plaintiffs' state law claims for negligence, breach of contract, personal injury, and wrongful death.  *See* Doc. # 41.  Dr. Bolin

---

[11]The Court notes that it was clearly established at the time in question that pretrial detainees have a Fourteenth Amendment right not to have their serious medical needs met with deliberate indifference by jail officials.  *Hare,* 74 F.3d at 650.

argues that Plaintiffs' state law claims are claims for medical malpractice, which require Plaintiffs to provide credible expert testimony. Bolin argues that since Plaintiffs have no competent evidence from a qualified expert witness establishing that Defendant Bolin had any duty to inmate Henson or that Bolin's actions were a proximate cause of Henson's injuries, summary judgment is appropriate. Dr. Bolin also argues that summary judgment is appropriate because Plaintiffs have no evidence that Bolin failed to provide adequate care. In response, Plaintiffs argue that summary judgment is inappropriate because they have produced evidence that Bolin entered into a contract with the County to provide certain services, but that these services were not provided, causing Henson's death.

The Court must determine whether Plaintiffs' state law claims are "health care liability claims" subject to Chapter 74 of the Texas Civil Practices and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE § 74.001 - 74.507. To prevail on a "health care liability claim," a party must, not later than 120 days after the date of a petition, serve on each party one or more expert reports. TEX. CIV. PRAC. & REM. CODE § 74.351. If an expert report has not been served as required, upon motion by a defendant, a court must dismiss the claim, with respect to the physician or health care provider, with prejudice to refiling. *Id.*

Dr. Bolin asserts that Plaintiffs have not provided an expert report, and Plaintiffs have not contested this point. This suit was filed on March 27, 2006, and the 120-day period within which to serve expert reports has long expired. Therefore, if Plaintiffs' state law claims are health care liability claims subject to the expert report requirement, dismissal of these claims is appropriate.

A "health care liability claim" is:

a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately result in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE § 74.001.  Texas courts have repeatedly held that plaintiffs cannot, through artful pleading, avoid the strictures now codified in Chapter 74 of the Texas Civil Practices and Remedies Code by recasting health care liability claims as other causes of action.  *Diversicare v. Rubio*, 185 S.W.3d 842, 849-854 (Tex. 2005).  If the act or omission alleged in the complaint is an inseparable part of the rendition of health care services, then the claim is a health care liability claim.  *Diversicare*, 185 S.W.3d at 849.

Here, Plaintiffs allege Dr. Bolin violated state law by failing to exercise the degree of care that a medical doctor would exercise, including failing to develop and follow an appropriate course of treatment for Henson, failing to monitor Henson's condition, and failing to properly train and supervise jail employees.  Plaintiffs also allege Dr. Bolin breached a contract between Bolin and the County by failing to provide services required by the contract.

The Court finds that Plaintiffs' state law claims against Dr. Bolin are health care liability claims subject to Chapter 74 of the Texas Civil Practices and Remedies Code.  Plaintiffs allege Bolin is liable because he departed from accepted standards of medical care.  These claims are an inseparable part of the rendition of health care services at the Wichita County jail facilities.  *See Diversicare,* 185 S.W.3d at 849-854 (under prior version of statute, court found claims arising out of injuries from plaintiff's fall from treadmill were heath care liability claims where doctor had ordered plaintiff to exercise); *Scientific Image Ctr. Mgmt. v. Brewer*, 282 S.W.3d 233, 237-240 (claims arising out of "botched" face lift met statutory definition of a health care liability

27

claim); *Educare v. Rice*, 2008 WL 2190988 at *1-4 (Tex.App.—Dallas 2008, no pet.) (plaintiff

brings a health care liability claim where plaintiff alleges abuse at nursing home occurred as a

result of, among other things, nursing home's failure to supervise employees); *Dunn v.*

*Clairmont Tyler, LP,* 271 S.W.3d 867, 870-72 (Tex.App.—Tyler, no pet.) (claims that nursing

home failed to report nurse aide's misconduct were health care liability claims); *Holguin v.*

*Laredo Reg'l Med. Ctr.*, 256 S.W.3d 349, 345-56 (Tex.App.—San Antonio 2008, no pet.)

(patient's claim against medical center for negligent hiring, training, and supervising of nurse

amounted to cause of action for departures from accepted standards of safety or health care, and

were therefore health care liability claims for which a timely filed expert report was required);

*Cook v. Withers,* 2004 WL 768948 at *2-3 (Tex.App.—Houston[14th Dist.] 2004, no pet.)

(finding patient's claims regarding breast implantation surgery were health care liability claims,

not negligence or breach of contract claims, where allegations were that physician's conduct fell

below acceptable standards of medical care).

     Since there is no issue of fact regarding whether Plaintiffs properly served expert reports

in connection with their state law health care liability claims, the Court finds that dismissal of

these claims is appropriate.

VI.    Conclusion

     For the foregoing reasons, the Court finds that Defendant Bolin's motion for summary

judgment (Doc. # 66, Doc. # 155) should be and is hereby **GRANTED in part,** and **DENIED in**

**part.**

     The Court finds that genuine issues of material fact exist regarding Plaintiffs' claims

under the Fourteenth Amendment brought pursuant to 42 U.S.C. § 1983.

The Court finds that summary judgment is appropriate with respect to Plaintiffs' claims under the Fourth Amendment brought pursuant to 42 U.S.C. § 1983, and with respect to Plaintiffs' state law claims.  Accordingly, these claims are hereby **DISMISSED with prejudice**.

**SO ORDERED** this **4**th day of **August, 2009.**

_Reed O'Connor_
**Reed O'Connor**
**UNITED STATES DISTRICT JUDGE**

29