IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

|  |  |  |
|---|---|---|
| ESTATE OF WILBERT LEE | § | |
| HENSON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 7:06-CV-44-O |
| | § | ECF |
| WICHITA COUNTY, TEXAS, et al., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are the following:

1.  Defendant Sheriff Thomas J. Callahan's Motion for Summary Judgment In His Individual Capacity (Doc. # 110), filed August 12, 2008;

2.  Defendants, Sheriff Callahan, In His Official Capacity, and Wichita County, Texas' Motion for Summary Judgment (Doc. # 111), filed August 12, 2008;

3.  The parties' Joint Appendix (Doc. # 116), filed August 13, 2008;

4.  Plaintiffs' Response to Defendant Sheriff Callahan's Motion for Summary Judgment In His Individual Capacity (Doc. # 130), filed September 15, 2008;

5.  Plaintiffs' Statement of Disputed Facts In Response to Defendant Sheriff Callahan's Statement of Undisputed Facts (Doc. # 130), filed September 15, 2008;

6.  Plaintiffs' Joint Appendix (Doc. #s 131, 132, 133), filed September 15, 2008;

7.  Plaintiffs' Appendix in Support (Doc. # 134), filed September 17, 2008;

8.  Defendant Sheriff Callahan's Reply to Plaintiffs' Response (Doc. # 146), filed October 7, 2008; and

9.   Defendant Sheriff Callahan's Brief In Support of His Reply (Doc. # 147), filed

October 7, 2008.

Having reviewed the relevant filings, the evidence, and the law applicable to the issues

raised, the Court finds as follows:

I.      Background

Plaintiffs are the daughters of Wilbert Henson ("Henson"), who died while being

detained at the Wichita County Jail.  Henson was arrested on November 23, 2004 on a bond

forfeiture warrant for driving with a suspended license.  Henson was taken to Wichita County

Jail, where Defendant Thomas J. Callahan ("Callahan") is sheriff.

At book-in, Henson complained of trouble breathing.  Michelle George ("George"), a

jail nurse, came to see Henson in the front tank.   Henson told her that he had Chronic

Obstructive Pulmonary Disease ("COPD") and emphysema, and also stated that he had recently

been to the emergency room, where he was told he had pneumonia.  Henson also informed Nurse

George that at the emergency room, he was given prescriptions for a "Z-pac" antibiotic,

prednisone, and an inhaler, but that he had not filled these prescriptions.  Nurse George gave

Henson an antibiotic, Keflex, and also gave Henson an albuterol inhaler.  Nurse George also

filled out a "pink card" requesting that Henson be put on the "doctor's call," which was

scheduled to be held the next morning at the downtown jail.[1]

That night, sometime after his visit with Nurse George, Henson was transferred from the

downtown jail to the another jail facility called "the annex."  Since Henson was on the doctor's

---

[1] Pink cards are cards that could be filled out by inmates or nurses to request that an inmate receive medical attention.

call for the downtown jail, and not the annex, Henson did not see a doctor the morning after

book-in.  When George arrived at the downtown jail on Wednesday, November 24, 2004, she

saw that Henson had been transferred to the annex.  George called the nurse at the annex and

asked that Henson be placed on the next doctor's call at that facility.  Usually, the jail physician,

Dr. Bolin, would have doctor's calls at the annex on Thursdays.  However, November 25, 2004

was Thanksgiving Day, and Dr. Bolin did not hold a doctor's call that day.

While at the annex, Henson complained to detention officers about his breathing, and

other inmates noticed Henson having difficulty breathing and requested medical treatment on his

behalf.  Around noon on November 26, 2004, another jail nurse, Kaye Krajca ("Krajca"), was

called to the annex.  Henson informed Nurse Krajca that he had COPD and pneumonia, and had

been to the hospital recently and had an antibiotic prescription.  Nurse Krajca filled out a pink

card for Henson to see Dr. Bolin at the next doctor's call, and also gave Henson a breathing

treatment.

In the evening on November 27, 2004, a detention officer called Nurse George and then

Nurse Krajca regarding Henson.[2]  Nurse George was called first, and authorized moving Henson

to a medical segregation cell (also known as "solitary" and the "doom room"), and asked that

Henson be observed every fifteen minutes after being moved to solitary.[3]  Nurse Krajca was then

contacted, authorized moving Henson to solitary, and asked that he be observed every thirty

minutes.

_____

[2] As is discussed in the Court's Memorandum Opinion and Order resolving Michelle George and Kaye Krajca's Motions for Summary Judgment, it is not clear whether detention officers called the nurses because of Henson's breathing troubles or for some other reason.

[3] It is not clear whether the detention officers or Nurse George first suggested moving Henson to medical solitary.

Around 11:00 p.m. on November 27, 2004, Henson's vital signs were assessed, showing a blood pressure reading of 208/107 and a heart rate of 92 beats per minute.[4]  It was also noted that Henson was sweating profusely at that time.  There is a dispute in the evidence as to whether Nurse Krajca was told this information.  *See* Memorandum Opinion and Order resolving Krajca and George's Motions for Summary Judgment.

After Nurse George and Krajca provided authorization, Henson was moved to a medical segregation cell.  The medical segregation cell was enclosed, and detention officers did not go into the cell to observe Henson, instead observing him through a small window in the cell door.  The detention officers kept an "inspection record" regarding their observations, marking down one of eighteen "codes" regarding what Henson was doing at a particular time.[5]

While in solitary, Henson was allowed breathing treatments every four hours.  The inspection records indicate that Henson received breathing treatments, administered by detention officers, at 2:15 a.m., 7:27 a.m., and 4:00 p.m. on November 28, 2004.  Henson received another breathing treatment at 3:25 a.m. on November 29, 2004.

At some point in the early morning hours on November 29, 2004, detention officers went to Henson's cell and found him in severe respiratory distress.  He was unable to walk or stand due to his severely deteriorated medical condition and shortness of breath.  Henson stated that he was "not going to make it."  As there was no nurse on duty, Nurse Ingram was called, and ordered that Henson be placed in a wheelchair and moved to a different room to administer a

---

[4] It is unclear on the record before the Court whether Henson's vitals were taken before or after he was moved to a medical segregation cell.

[5] For example, the officers marked "A" in the "remarks" section of the inspection record if Henson was awake, "S" if he was sleeping, and "D" if Henson was "at door."

breathing treatment.  Henson's vital signs were again assessed, showing a blood pressure reading of 231/151 and a heart rate of 53 beats per minute.  Jail detention officers attempted to administer the breathing treatment shortly after 5:00 a.m., but Henson was too weak to hold the hand-held breathing device, and became incoherent and lethargic.  A detention officer attempted unsuccessfully to hold the device near Henson's mouth in order to administer the medication. Henson told the detention officers "I'm done.  I'm not gonna [sic] make it."  Detention officers then began to massage Henson's shoulders and fan him with a tupperware lid, while trying to "motivate him to stay alive."  After a minute or two of struggling, Henson passed out, began "gurgling," and his eyes rolled back in his head.  Henson was rushed to the hospital where he died.  The Tarrant County Medical Examiner reported his cause of death as chronic obstructive pulmonary disease.

Plaintiffs filed this lawsuit on March 27, 2006, bringing claims arising out of Henson's death against Wichita County, Sheriff Thomas J. Callahan, and jail nurses Krajca and George.[6] Plaintiffs bring claims under 42 U.S.C. § 1983 against Sheriff Callahan, in his individual and official capacities, and against Wichita County, and also seek damages from Callahan and Wichita County under the  Texas Survival Statute and Texas Wrongful Death Act.  *See* Doc. # 41 (amended complaint).  Additionally, Plaintiffs bring claims under the ADA and Rehabilitation Act against Defendant Wichita County.  *Id.*

On August 12, 2008, Defendant Callahan filed his Motion for Summary Judgment In His Individual Capacity.  That same day, Callahan, along with the County, filed another Motion for Summary Judgment, moving for summary judgment with respect to claims against the County

---

[6] Various detention officers and other jail employees were also sued, but were dismissed in their individual capacities from this action after a stipulation of dismissal, signed by the parties, was filed.

and claims alleged against Callahan in his official capacity.

The issues have been briefed, and these motions are ripe for determination.

II.    Legal Standards

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "[T]he substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Id.*  The movant makes a showing that there is no genuine issue of material fact by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(c).

Once the movant makes this showing, the non-movant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial.  *Celotex*, 477 U.S. at 323-24.  To carry this burden, the "opponent must do more than simply show. . . some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  Instead, the non-movant must show that the evidence is sufficient to support a resolution of the factual issue in his favor.  *Anderson*, 477 U.S. at 249.  Neither conclusory allegations nor unsubstantiated assertions will satisfy the non-movant's summary judgment burden.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).  The party opposing summary judgment is required to identify specific evidence in the record and to

6

articulate the precise manner in which that evidence supports his claim.  *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  Summary judgment in favor of the defendant is proper if, after adequate time for discovery, the plaintiff fails to establish the existence of an element essential to his case and to which he will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322-23.

When weighing the evidence on a motion for summary judgment, the Court must decide all reasonable doubts and inferences in the light most favorable to the non-movant.  *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988).  The Court cannot make a credibility determination in light of conflicting evidence or competing inferences.  *Anderson*, 477 U.S. at 255.  As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied.  *Id.* at 250.

III.   Analysis

The Court first considers summary judgment with respect to Plaintiffs' claims against Defendant Callahan in his individual capacity.

**A.    Plaintiffs' § 1983 claims against Defendant Callahan in his individual capacity**

To state a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate: (1) a violation of the United States Constitution or of federal law; and (2) that the violation was committed by someone acting under color of state law.  *See Attenberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252-53 (5th Cir. 2005).  In this case, Plaintiffs claim that Defendant Callahan, sheriff of Wichita County, violated Henson's Fourth and Fourteenth Amendment rights by denying him adequate medical care.  Defendant Callahan argues that Plaintiffs have failed to establish any

7

constitutional violation and that, even assuming such a violation, he is entitled to qualified immunity.

The doctrine of qualified immunity protects government officials sued pursuant to § 1983 "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, ----U.S.----, 129 S.Ct. 808, 815 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Id.* This doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Courts generally apply the two-pronged analysis established in *Saucier v. Katz*, 533 U.S. 194 (2001), in determining whether a government official is entitled to qualified immunity for an alleged constitutional violation. The first prong of the *Saucier* analysis asks whether, taken in the light most favorable to plaintiff, the facts alleged show that the official's conduct violated a constitutional right. *See Scott v. Harris*, 550 U.S. 372 (2007) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). Under *Saucier*, if, and only if, the Court finds a violation of a constitutional right, the Court then asks whether the right was clearly established in light of the specific context of the case. *Id.* If there is evidence to support the violation of a constitutional right, the Court asks whether, nevertheless, qualified immunity is appropriate because defendant's actions were objectively reasonable "in light of clearly established law at the time of the conduct in question." *Hampton Co. Nat'l Sur., L.L.C. v. Tunica County, Miss.,* 543 F.3d 221, 225 (5th Cir. 2008).

The Supreme Court has recently clarified that it is no longer mandatory for courts to consider the two prongs set out in *Saucier* in order, although the Court noted that it may be beneficial to do so. *Pearson,* 129 S.Ct. at 815. Under *Pearson*, courts are now permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Id.*

The usual summary judgment burden of proof is altered in the context of a defense of qualified immunity. *See Gates v. Texas Dep't of Protective and Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008). An official need only plead his or her good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law. *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005) (citing *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)). To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present "absolute proof," but must offer more than "mere allegations." *Ontiveros v. City of Rosenburg, Tex.,* No. 08-20081, 2009 WL 807450 at *2 (5th Cir. Mar. 20, 2009).

Defendant Callahan pleaded the affirmative defense of qualified immunity. At the summary judgment stage, a determination of whether a constitutional right was violated overlaps substantially with the determination of whether the first prong of the qualified immunity analysis is satisfied. Accordingly, the Court first addresses whether Plaintiffs have raised a genuine issue of material fact that Defendant Callahan violated Henson's rights under the Fourth and Fourteenth Amendments, and then considers whether Defendants' actions were objectively unreasonable under the qualified immunity analysis.

**1.     Plaintiffs' Fourth Amendment claim against Callahan in his individual capacity**

Defendant moves for summary judgment on Plaintiffs' 42 U.S.C. § 1983 claims under the Fourth Amendment, and argues that since Henson was a pretrial detainee at the time of the alleged constitutional violation, the Fourth Amendment is inapplicable.  Plaintiffs' response did not address summary judgment with respect to their Fourth Amendment claims.

A person's apprehension by the use of deadly force is subject to the Fourth Amendment's reasonableness requirement. *Tennessee v. Garner*, 471 U.S. 1 (1985).  However, an arrestee's Fourth Amendment protections end when he becomes a pretrial detainee.  *See Valencia v. Wiggins*, 981 F. 2d 1440 (5th Cir. 1993) (pretrial detainee's excessive force claims not cognizable under Fourth Amendment during pre-trial detention and subsequent to initial arrest). Instead of the Fourth Amendment, a pretrial detainee's claims for denial of medical care are based in the Fourteenth Amendment.  *See Wagner v. Bay City, Tex.*, 227 F.3d 316, 324 (5th Cir. 2000) (denial of medical care claims flow from the procedural and substantive due process clause of the Fourteenth Amendment).

The Court finds that there is no issue of fact that Henson was a pretrial detainee at the time his constitutional rights were allegedly violated, and therefore summary judgment is appropriate with respect to Plaintiffs' Fourth Amendment claims.

Accordingly, Defendant's Motion for Summary Judgment with respect to Plaintiffs' § 1983 claims based on a violation of the Fourth Amendment should be and is hereby **GRANTED.**

**2.     Plaintiffs' Fourteenth Amendment claim against Callahan in his individual capacity**

Defendant Callahan also asserts that he is entitled to summary judgment with respect to Plaintiffs' § 1983 claims based on violation of the Fourteenth Amendment.  Defendant Callahan notes that he did not have any personal involvement with inmate Henson, and argues that he did

10

not fail to supervise or train those who provided medical care to Henson.

### a.      Denial of Medical Care

Defendant Callahan asserts that he is entitled to summary judgment because Plaintiffs have failed to produce evidence raising a genuine issue of material fact that Callahan was deliberately indifferent to Henson's medical needs.  The Fifth Circuit has recognized a pretrial detainee's Fourteenth Amendment right not to have his serious medical needs met with deliberate indifference by jail officials.[7]  *Hare v. City of Cornith, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996).  A prison official acts with deliberate indifference only if the official (A) knows that the inmate faces a substantial risk of serious bodily harm and (B) disregards that risk by failing to take reasonable measures to abate it.  *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  Mere negligence will not suffice, and deliberate indifference cannot be inferred from a failure to act reasonably.  *See Hare*, 74 F.3d at 649-50.  Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances.  *Id.; Gobert*, 364 F.3d at 347; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999).  Deliberate indifference requires a showing that officials refused to treat the detainee, ignored his complaints, intentionally treated him incorrectly, or engaged in similar conduct that would clearly evince a wanton disregard for any serious medical needs. *Domino v. Tex. Dept. of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001).

The undisputed evidence shows that Defendant Callahan did not know inmate Henson

---

[7] Because Plaintiffs complain that jail personnel provided inadequate medical care, this case is an episodic act or omission claim, which requires Plaintiffs to show Defendants acted with deliberate indifference.  *See Hare*, 74 F.3d at 645.

and had no contact with Henson while he was at the Wichita County jail facilities. Accordingly, Plaintiffs have failed to establish Callahan is liable under § 1983 based on any direct interaction with inmate Henson.

Even though there is no evidence that Callahan interacted directly with Henson, Callahan may still be held personally liable, under certain circumstances, for failing to train or supervise jail staff. Accordingly, the Court now considers whether Plaintiffs have produced evidence raising a genuine issue of fact regarding whether Callahan failed to supervise or train subordinates.

**b.      Failure to Train/Supervise**

A supervisory official may be held liable under § 1983 for the wrongful acts of a subordinate "when [the supervisory official] breaches a duty imposed by state or local law, and this breach causes plaintiff's constitutional injury." *Smith,* 158 F.3d at 911. To hold a supervisory official liable for failure to train or supervise subordinates, the plaintiff must show that (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference. *Id.* at 911-12 (citing *Hinshaw v. Doffer*, 785 F.2d 1260, 1263 (5th Cir. 1986)). "[T]he misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor." *Southard v. Texas Bd. Of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997). Only the direct act or omission of the supervisory official will give rise to individual liability under § 1983; a supervisor may not be held individually liable under a theory of *respondeat superior. Coleman v. Houston Indep. Sch. Dist.,* 113 F.3d 528, 534 (5th Cir. 1997).

Defendant Callahan argues that Plaintiffs have failed to raise a genuine issue of material fact that Callahan failed to supervise or train jail staff. Callahan notes that jail staff receive the appropriate level of state-mandated training, precluding liability for failure to train.

Plaintiffs argue that they have produced evidence that jail nurses, including Nurse Krajca, assessed, diagnosed, and prescribed medications and made final treatment decisions without proper supervision. Plaintiffs also argue that Callahan failed to supervise jail physician Dr. Bolin, who intimidated the nursing staff and discouraged nurses from seeking emergency care for inmates.

The Court now considers whether Plaintiffs have raised a genuine issue of material fact that Callahan failed to supervise jail nurses and Dr. Bolin.

### i.     Callahan's role as supervisor

As an initial matter, the Court finds it necessary to address Defendant Callahan's supervisory role with respect to jail nurses and Dr. Bolin, the jail physician. Callahan has produced evidence that Dr. Bolin signed an employment contract with the County, a contract to which Callahan is not a signatory, that provides, among other things, that Dr. Bolin will supervise the jail nursing staff in their professional capacities. Pls App. at 312-13.[8] Callahan has testified that, while he has the power to hire and fire nurses, Bolin is responsible for supervising the nurses' provisioning of medical care. Callahan testified that if the jail physician was not supervising the nurses in their professional activities, then there was no one at the jail supervising the nurses in their professional activities. *Id.* at 313.

---

[8] The Court will use the abbreviation "Pls' App." when referencing evidence submitted by Plaintiffs in opposition to Defendant Callahan's motion for summary judgment. This evidence can be found on the Court's docket at document numbers 131-134.

In contrast, Dr. Bolin testified that he is not the jail nurses' supervisor, and that sheriff Callahan is their supervisor.  Pls' App. at 277.  Dr. Bolin states that he only supervises jail nurses when he is physically present at the jail facilities or if the nurses call him on the phone, and does not supervise nurses otherwise.  *Id.* at 276.  Dr. Bolin testified that he has never sat down and talked with Nurse Kracja, or any other jail nurse, regarding her job performance because the nurses do not work for him.  *Id.* at 282.

The Court finds that, while Defendant Callahan has produced evidence suggesting that Bolin may supervise jail nurses in some capacity, Plaintiffs have produced evidence suggesting that Defendant Callahan is also responsible for supervising jail nurses.  Defendant Callahan admits in his deposition testimony that he considers himself supervisor to the extent the nurses are engaging in nonprofessional behavior, and that he and the County, not Dr. Bolin, hired the jail nurses.  Pls' App. at 313, 326, 333.1, 336.  The Court notes that Texas law provides that the sheriff of each county is the keeper of the county jail, and requires the sheriff to safely keep all prisoners committed to the jail by lawful authority.  TEX. LOCAL GOV'T CODE ANN. § 351.041(a) (Vernon Ann. 2007).  Thus, the Court concludes that Plaintiffs have produced evidence raising a genuine issue of fact that Callahan is a supervisory official who, under appropriate circumstances, can be held liable for failure to train or supervise jail nurses.

Similarly, the Court finds that the evidence raises a genuine issue of material fact regarding whether Defendant Callahan supervised Dr. Bolin.  While Dr. Bolin's employment contract is with the County, the evidence suggests that Callahan, as sheriff of the jail, has a role in supervising Dr. Bolin.  For example, Callahan testified that when nurses had issues with Dr. Bolin, they would bring complaints to Callahan for resolution, sometimes resulting in Callahan

speaking with Bolin about the issues.  Pls' App. at 333.1.  In addition, under the Attorney

General's office's interpretations of Texas law, while the commissioners court has authority to

contract with Dr. Bolin, the authority of the commissioners court over the jail is limited to

providing the jail adequate funding and broad operational guidelines; the sheriff bears

responsibility for the actual operation of the jail, and is authorized to schedule the physician's

services at the jail.  *See* DM-111 Op. Att'y Gen. (1992); *see also* TEX. LOCAL GOV'T CODE ANN.

§ 351.061 (Vernon 2005).  In light of the law and evidence regarding Callahan's role as

supervisor, the Court concludes that Defendant Callahan is a supervisory prison official who,

under the appropriate circumstances, can be held liable for failing to supervise or train Dr. Bolin.


### ii.      Callahan's supervision of jail nurses and jail physician

Plaintiffs argue that Dr. Bolin intimidated nurses and discouraged nurses from seeking

emergency care for inmates.  Plaintiffs further allege that Callahan was aware of this issue, but

failed to take proper supervisory action.  In support of this, Plaintiffs have produced evidence

including: (1) the affidavits of former jail nurses Pathena Dawn Tweed and Dawn Marie

Wilkinson, (2) Callahan's deposition testimony, and (3) evidence relating to the death of former

jail inmate Jason Brown.

### Affidavits of Former Jail Nurses

Plaintiffs have submitted affidavits from former jail nurses Pathena Dawn Tweed and

Dawn Marie Wilkinson.  *See* Pls' App. at 430-437.  Both nurses averred that they have

personally observed Dr. Bolin berate jail nurses who called him for medical instruction or

direction, and that Dr. Bolin's demeanor intimidated the nurses working under him.  *Id.*  Both

nurses further averred that they personally feared calling Bolin for fear of unwarranted criticism.

Ms. Tweed and Ms. Wilkinson further averred that they and other members of the nursing staff perceived that Dr. Bolin did not want inmates being sent to the emergency room because it would be Dr. Bolin's responsibility to then go to the hospital to provide care for the inmate.  *Id.* Wilkinson stated that she personally experienced this when a female inmate complained of abdominal pains, and reported that she had been raped prior to being arrested and detained.  Wilkinson stated that she inspected the inmate, and discovered that the inmate had a tampon lodged deep into her body that neither she nor the inmate could remove.  Wilkinson further averred that she recognized the situation required immediate medical attention, so she called Dr. Bolin for medical instruction, but was advised not to send the inmate to the emergency room and to remove the tampon herself.  Wilkinson stated that she disobeyed Dr. Bolin's instruction, calling an ambulance and driving her own vehicle to the hospital to be with the inmate.

Ms. Tweed averred to a similar situation involving an inmate with very low blood sugar. Tweed stated that she called Dr. Bolin for instruction regarding the inmate and that Dr. Bolin informed her not to send the inmate to the emergency room "under any circumstances," advising Ms. Tweed to take whatever action she believed necessary to bring the inmates blood sugar levels up.  Tweed stated that after several failed attempts to raise the inmate's blood sugar level, she had the inmate transported to the hospital for emergency treatment.  Tweed stated that, upon learning of her decision to send the inmate to the emergency room, Dr. Bolin became very irate, yelled at Ms. Tweed, and questioned why she had defied his orders.

Ms. Tweed and Ms. Wilkinson both averred that they spoke with Sheriff Callahan about Dr. Bolin's treatment of them and other nurses, but that they were advised something to the effect that "this is just the way he (Bolin) is" and were instructed to ignore Bolin's behavior.

**Callahan's Testimony**

Plaintiffs have produced Defendant Callahan's deposition testimony, including testimony in which he acknowledges that he received complaints regarding Bolin's treatment of employees at the jail. Pls' App. at 333.1. Specifically, Callahan testified that he heard that Bolin gripes all the time at employees, including the nurses, about everything. *Id.* Callahan stated that he had been told that Bolin is grumpy when he is awakened in the middle of the night, and that Bolin doesn't like to be bothered. *Id.* Callahan testified that this is a common reputation that Bolin has among nurses. *Id.* Callahan further testified that nurses were told to ignore this, and to call Bolin any time that they need to. *Id.* Callahan stated that he has spoken with Bolin about this two or three times over the past ten to twelve years, and that Callahan told Bolin to "sweeten up" and "get a little nicer." *Id.*

**Inmate Brown's death**

Plaintiffs and Defendant Callahan have produced evidence regarding the death of inmate Jason Brown. This evidence, viewed in the light most favorable to Plaintiffs, indicates that Jason Brown was arrested on a drug charge and brought to the Wichita County jail on July 22, 2004, approximately four months before Henson was detained at the Wichita County jail. Def's Reply App. at 689.[9] En route to the jail, Brown began crying and pleaded with the arresting officer to

---

[9]The Court will use the abbreviation "Def's Reply App." when referencing evidence submitted by Defendant with his Reply Brief. This evidence can be found on the Court's docket at document number 147.

release him because he had medical problems and did not have long to live.  *Id.* 694-95.  The arresting officer advised the jail staff upon arrival at the jail of Brown's medical problems.  *Id.* at 692.  After intake procedures were completed, Brown was put in the general inmate population.  *Id.* at 689.

Around 11:42 p.m. on July 23, 2004, someone in the general population tank pushed the emergency button and notified the control room that an inmate had thrown up blood.  Pls' App. at 438; Def's Reply App. at 689.  Detention officer Dickey Lee Sours, Jr. responded to the call, and found Brown laying on his side next to a puddle of blood 1 to 1.5 feet in width and 2 to 2.5 feet in length, with chunks of food in the puddle.  *Id.*  Nurse Krajca was called, and over the phone, Krajca asked the detention officers to give Brown some liquid antacids.  *Id.*

Later, Brown complained that he was in pain and begged for help.  *Id.*  Krajca was again called, and asked "did anyone actually see him (Brown) throw up the blood?"  Pls' App. at 438; Def's Reply App. at 693-94.  Sours responded, "Kaye (Krajca), I had to clean it up."  *Id.*  Krajca advised that Brown should be given suppositories, but Brown would not take them.  *Id.*  Krajca was called again and told that Brown was not coherent.  Pls' App. at 438; Def's Reply App. at 694.  Kracja then went to the jail to visit Brown.  Pls' App. at 438; Def's Reply App. at 691.

There is a dispute in the evidence regarding what happened next.  There is evidence suggesting that Krajca told investigators that when she arrived at the jail, Brown told her he had nausea and vomiting, and also informed her that he had several medical problems including Auto Immune Chronic Hepatitis A, B, and C, Esophageal Varices, Jaundice, Spleenial Magaly, and anemia.  Def's Reply App. at 691.  However, a memorandum drafted by detention officer Sours indicates that when Krajca arrived, she couldn't get Brown to respond.  Pls' App. at 438; Def's

18

Reply App. at 694.

There is no dispute that Krajca then had Brown moved to medical solitary, and gave

Brown suppositories.  *Id.*  Krajca told investigators she provided suppositories pursuant to a

standing order.  Def's Reply App. at 691.  Later, during a cigarette break, Nurse Krajca asked

Sours "[d]o you know what kind of ass chewing I would get from Dr. Bolin if I sent him

(Brown) to the hospital in the good health that he is in?"  Pls' App. at 439; Def's Reply App. at

694.

Jason Brown died from a massive gatrointestinal hemmorage at the age of 26.  Def's

Reply App. at 715.  It is difficult for the Court to determine when inmate Brown died because

various Wichita County documents identify different dates of death.  The custodial death report

indicates that Jason Brown died at 12:15 a.m. on July 24, 2004.  *Id.*  The investigator's report

states that Brown's death occurred at 12:15 a.m. on August 25, 2004, although the report itself is

dated August 20, 2004.  Def's Reply App. at 689.  However, the report also states that Nurse

Krajca told investigators she was called at 11:30 p.m. on July 24, 2004 and was told Brown was

pulseless, suggesting 12:15 a.m. on July 25, 2004 was when imate Brown was pronounced dead.

*See* Def's Reply App. at 691.

After Brown's death, an investigation was conducted, finding no evidence of foul play

and concluding that Brown died of natural causes.  Def's Reply App. at 689-96.  The report,

signed by Callahan and dated August 20, 2004, contains the facts outlined above, including that

Nurse Krajca made a statement to detention officer Sours regarding the "ass-chewing" she would

get from Bolin if she sent Brown to the hospital.  *Id.*

Plaintiffs have produced evidence that, after Brown's death, Dr. Bolin did not speak with

Krajca about the medical care she provided to Brown, even though he does not agree with the actions she took.  Plaintiffs have produced Dr. Bolin's testimony that Nurse Krajca should have called him or transported Brown to the emergency room, rather than moving Brown to medical solitary, but that he did not speak to Nurse Kracja about her failure to call him, her failure to send Brown to the emergency room, or her use of medical segregation.[10]  *Id.*

Plaintiffs have produced evidence suggesting that no one at the jail, including Defendant Callahan, apprised Dr. Bolin of the circumstances of Brown's death.  Dr. Bolin testified that the first time he learned about the events pertaining to Jason Brown's death was when he was served with the lawsuit.  Doc. # 156 at 29.[11]  At Callahan's deposition, Plaintiffs' counsel represented to Callahan that Bolin previously testified that he did not know about Brown's death until he was served with legal papers relating to Brown's death sometime during the summer of June of 2005. *Id.*  Defendant Callahan testified that he had no firsthand knowledge regarding when Dr. Bolin became aware of Brown's death, but noted that it was in the news and that the nurses would probably have told Bolin about it.  *Id.*  Callahan further testified that there were no procedures for notifying the physician of an inmate death, but that he's sure he and Bolin have discussed the issue "in passing."  *Id.* at 335.  The evidence suggests that Dr. Bolin was not contacted by

---

[10]  There is undisputed evidence that Dr. Bolin was not in town on the night Brown died.  Pls' App. at 287.  The Court does not find that this evidence demonstrates that Bolin and his alleged nurse intimidation custom did not play a role in Krajca's decision not to send Brown to the hospital, particularly in light of the evidence suggesting that Krajca made statements to detention officer Sours indicating that she was worried Bolin would have been upset if she had sent Brown to the hospital.  It is not clear on the record before the Court whether Krajca was aware Bolin was out of town, or what procedures were in place in light of his absence.

[11]  Doc. # 156 was submitted by Plaintiffs in connection with Defendant Bolin's motion for summary judgment.  Though not submitted in connection with Dr. Bolin's motion for summary judgment, the Court considers the full record before the Court including the pleadings, depositions, answers to interrogatories, admissions, and affidavits.  Fed. R. Civ. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988).

anyone in connection with the investigation of Brown's death.  *See* Def's Reply App. at 689-717.

Plaintiffs have also produced evidence that Defendant Callahan's only interaction with Krajca relating to Brown's death occurred when Callahan asked Krajca to bring him a copy of the jail's standing orders, and Krajca did this.  Pls' App. at 334.  Callahan testified that he wanted Krajca to bring him a copy of the standing orders to make sure there "was such a thing" because Krajca told investigators that she followed standing orders in providing medical care to Brown.  Pl's App. at 334.

**Evidence raises issues of fact regarding failure to supervise**

The Court finds, deciding all reasonable doubts and inferences in the light most favorable to Plaintiffs, that the evidence, including affidavits from former nurses, Callahan's deposition testimony, and evidence regarding the death of Jason Brown, demonstrates that there are genuine issues of material fact regarding whether Defendant Callahan failed to supervise jail nurses and the jail physician.  Plaintiffs have produced evidence raising issues of fact regarding whether Dr. Bolin intimidated nurses and discouraged nurses from seeking emergency care for inmates. Plaintiffs have produced evidence suggesting that, due to Bolin's opposition to seeking emergency care for inmates, jail nurses on a number of occasions had to disobey Dr. Bolin's direct orders in order to provide care for inmates with serious medical needs.  *See* Pls' App. at 430-37.  The evidence suggests that, in other situations, Dr. Bolin's opposition to seeking emergency care resulted in nurses, specifically Nurse Krajca, not calling Dr. Bolin or transporting sick inmates to the hospital.  *See* Pls' App. at 438; Def's Reply App. at 689-717.

The evidence also suggests that Callahan was aware of Bolin's custom.  While the affidavits of Pathena Tweed and Dawn Wilkinson do not set out specifically what information

was given to Sheriff Callahan regarding Dr. Bolin's treatment nurses, it is reasonable to infer that Sheriff Callahan was told about the specific incidents noted in the affidavits, including details concerning treatment of the inmate with low blood sugar and the inmate that had been raped.  *See* Pls' App. at 430-37.  The Court must decide all reasonable doubts and inferences in the light most favorable to the non-movant, and therefore finds the affidavits raise an issue of fact regarding whether Callahan was aware that Dr. Bolin engaged in intimidation of nurses and discouraged them from seeking emergency care for inmates with serious medical needs.  *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988).

Further, the evidence suggests that Defendant Callahan, who is responsible under state law for the safety of inmates at the Wichita County jail,  responded to evidence of nurse intimidation by asking Bolin to "sweeten up" and by telling the jail nurses to put up with it.  The evidence also suggests that Callahan discussed inmate Brown's death with Dr. Bolin only "in passing," and briefly met with Nurse Kracja only so that she could prove the existence of standing orders she had claimed to have used in treating Brown.  The evidence further suggests that jail nurses' were completely unsupervised in providing medical care whenever Dr. Bolin was not physically present at the jail unless the jail nurses call Bolin for direction, which Bolin discouraged.[12]  Accordingly, the Court finds that Plaintiffs have raised genuine issues of material fact regarding whether Defendant Callahan failed to supervise the jail nurses and Dr. Bolin.

---

[12]   The Court notes that Dr. Bolin testified that he was only present at the jails during "doctor's call" which generally occurred three times a week - on Mondays and Thursdays at the annex facility, and on Wednesdays at the downtown jail facility.  Pls' App. at 291.  However, Wichita County Sheriff's Office General Order 30.03, dated September 15, 2002, states that the jail physician will conduct sick calls at both the downtown jail and the annex facility at least twice a week.  Doc. # 116 at 145.  Bolin testified that he estimates that he spends 25-33% of his time working for Wichita County, spending the rest of his time in private practice.  *Id.* at 273.

### iii.     Causal Link

The Court finds that Plaintiffs have produced evidence raising a genuine issue of fact regarding whether there is a causal link between Callahan's alleged failure to supervise Bolin and jail nurses and the resulting violation of Plaintiffs' rights.  Plaintiffs have raised genuine issues of fact regarding whether Dr. Bolin intimidated and discouraged nurses, including Nurse Krajca, from seeking emergency care for inmates, and that Callahan was aware of this issue, but failed to take proper supervisory action.  In addition, in Henson's case, as well as with respect to inmate Brown, there is evidence suggesting that Nurse Krajca was aware of the inmates' need for emergency care, but that Nurse Krajca, instead of seeking emergency care, moved the inmates to medical solitary.  Further, Plaintiffs have produced evidence that both Henson and Brown would have been saved if emergency care had been provided for them.  Pls' App. at 302 (Supplemental Expert Report of Jacqueline Moore, R.N., Ph.D., CCHP-A).  Accordingly, the Court finds that Plaintiffs have raised genuine issues of fact regarding whether Defendant Callahan's failure to supervise Dr. Bolin and the jail nurses, including Nurse Krajca, is causally linked to violation of the constitutional rights at issue here.

The Court now considers whether Plaintiffs have raised an issue regarding whether Callahan was deliberately indifferent to Henson's serious medical needs in failing to supervise Bolin and Krajca.

### iv.     Deliberate Indifference

For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference.  *Smith,* 158 F.3d at 911.  Deliberate indifference can be inferred from

the fact that the risk of harm is obvious.  *Hope v. Palzer*, 536 U.S. 730 (2002).

Here, Plaintiffs have produced evidence raising genuine issues of fact regarding whether Callahan was aware that Dr. Bolin engaged in a practice of intimidating and discouraging nurses from seeking emergency care for inmates.  To the extent such a custom existed and Callahan was aware of the custom, the Court finds that the obviousness of the risk of harm from such a custom is sufficient to raise a fact issue regarding whether Callahan was aware of facts from which the inference could be drawn that his failure to supervise Bolin and jail nurses posed a substantial risk of serious harm to inmates.  In addition, the obviousness of the risk of harm also creates a genuine fact issue regarding whether Defendant Callahan in fact drew the inference that his failure to supervise would cause harm.  *See Smith*, 158 F.3d at 912; *Farmer*, 511 U.S. at 842 (stating that a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious).

In addition, evidence regarding the death of Jason Brown suggests that Callahan was aware of a specific incident where Bolin's custom played a role in the death of a jail inmate.  The Court notes that Callahan signed the investigative report regarding Brown's death, which included Krajca's statement to detention officer Sours regarding the "ass chewing" that she would have gotten from Dr. Bolin had she sent Brown to the hospital.  Similarly, the affidavits of former jail nurses suggest that Callahan was aware that Bolin's custom resulted in a substantial risk of serious harm.  These affidavits indicate that two jail nurses told Callahan that they had to disobey Dr. Bolin's direct orders not to seek emergency care in order to provide care for inmates with serious medical needs.  Pls' App. at 430-437.  Accordingly, the Court finds that Plaintiffs have raised a genuine issue of material fact regarding whether Callahan was aware of facts from

which the inference could be drawn that a substantial risk of serious harm existed, and also drew

the inference that his failure to supervise Bolin and jail nurses created a substantial risk of

serious harm to inmates.  Further, as noted above, there is evidence that, in spite this awareness,

Callahan did little to nothing in response to supervise jail nurses or Dr. Bolin.  The Court finds

that this evidence raises genuine issues of material fact regarding whether Defendant Callahan's

failure to supervise demonstrates wanton disregard to the constitutional rights of inmates at the

Wichita County jail, rising to the level of deliberate indifference.[13]

The Court now considers whether Defendant Callahan is entitled to summary judgment

with respect to Plaintiffs' claims based on Callahan's adoption or maintenance of customs or

policies at the jail.

**c.      Policy or Custom**

Defendant Callahan also claims that he is entitled to summary judgment, in his individual

capacity, because Plaintiffs have failed to produce evidence that Callahan adopted or maintained

jail policies and procedures with deliberate indifference.  Plaintiffs respond that Callahan knew

of a widespread custom and practice of nurse intimidation and discouragement from seeking

emergency care for inmates, and was also aware of the substantial risk of harm to inmates caused

by this custom.

As noted above, supervisory liability may exist without an official's overt personal

---

[13]  Plaintiffs also allege that Defendant Callahan failed to train or supervise detention officers at the Wichita County jail.  However, the Court finds that Plaintiffs have failed to raise a genuine issue of material fact regarding this allegation.  Plaintiffs point to the fact that medically trained personnel are not at the jail twenty-four hours a day, seven days a week, but the Court finds, assuming the truth of this assertion, there is no requirement that the jail provide medically-trained personnel around the clock, particularly where the jail has in place an "on-call" system, and that Plaintiffs have failed to produce evidence raising an issue as to whether any under-staffing was causally linked to Plaintiffs' harm in this case.

participation in the direct offensive act in certain circumstances.  Such circumstances include

situations where officials implement, adopt, or maintain a custom or policy that is so deficient

that the policy itself is a repudiation of constitutional rights and is the moving force of a

constitutional violation.  *See Cozzo v. Tangipahoa Parish Council-President Gov't*, 279 F.3d

273, 289 (5th Cir. 2002).  An official policy is:

> 1.  A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by [the government entity] ... or by an official to whom the [entity] ha[s] delegated policy-making authority; or

> 2.  A persistent, widespread practice of ... officials or employees, which , although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represent [the entity's] policy.

*Id*. (citing *Johnson v. Moore,* 958 F.2d 92, 94 (5th Cir. 1992).  A plaintiff may also establish a

custom or policy based on an isolated decision made in the context of a particular situation if the

decision was made by an authorized policymaker in whom final authority rested regarding the

action ordered.  *Id.; City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-25 (1988); *Bennett v.*

*Pippin,* 74 F.3d 578, 586 (5th Cir. 1996).

The Court finds, based on the evidence discussed above, that Plaintiffs have produced

evidence raising a genuine issue of material fact regarding whether Dr. Bolin engaged in a

widespread practice or custom of intimidating nurses and discouraging nurses from seeking

emergency care for inmates with serious medical needs.  The evidence also raises issues of fact

as to whether Defendant Callahan was aware of the custom and the substantial risks it posed, but

failed to respond appropriately, causing constitutional harm.  The Court finds that this evidence

also raises genuine issues regarding whether Callahan adopted, maintained, or acquiesced to

Bolin's custom, whether this custom presents a substantial risk of harm, and also regarding

26

whether this custom was the moving force of the constitutional violation at issue in this case.

The Court now considers whether, even though genuine issues of material fact exist as to whether Callahan failed to supervise jail nurses and Bolin, and whether Callahan adopted, maintained, or acquiesced to a custom causing constitutional deprivation, Defendant Callahan is nevertheless entitled to summary judgment on his defense of qualified immunity.

**d.      Qualified Immunity**

In determining whether summary judgment on the ground of qualified immunity is appropriate, the Court first considers whether Plaintiffs have presented evidence raising a fact issue material to the resolution of the question of whether Defendant Callahan acted in an objectively reasonable manner in view of the existing law and facts available to him.  *See Lampkin v. City of Nacagdoches*, 7 F.3d 430, 435 (5th Cir. 1993).  If reasonable public officials could differ as to whether Callahan's actions were lawful, Callahan is entitled to immunity.  *See Malley*, 475 U.S. at 341 (1986).  "Even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity if the conduct was objectively reasonable."  *Zarnow v. City of Wichita Falls, Tex.*, 500 F.3d 401, 408 (5th Cir. 2007) (quoting *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990)).  In addition, the Court must also consider whether Plaintiffs have raised an issue of fact regarding whether the defense of qualified immunity is unavailable because the defendant is plainly incompetent or knowingly violated the law.  *See Malley*, 475 U.S. at 341.

The Court finds that a genuine issues of material fact exist regarding whether Defendant Callahan acted in an objectively reasonable manner in view of the clearly established law at the time of the conduct in question, in light of the facts available to him, precluding the Court from

granting summary judgment on the grounds of qualified immunity.  Plaintiffs have produced

evidence raising genuine issues of material fact regarding whether Defendant Callahan knew that

Dr. Bolin intimidated nurses and discouraged nurses from seeking emergency care for inmates

with serious medical needs and knew the harm that would result from such a policy, but failed to

respond with any meaningful supervisory action.  The Court has also found that genuine issues

of material fact exist regarding whether Callahan knew of Bolin's custom of nurse intimidation,

and adopted, maintained, or acquiesced to this custom.  Accordingly, the Court finds, based on

the evidence before it, that Plaintiffs have raised a fact issue as to whether Callahan was

objectively reasonable in view of the facts known to him at the time in question in light of

clearly established law at the time of the conduct in question.[14]

In addition, the Court finds that Plaintiffs have produced evidence suggesting that the

defense of qualified immunity is unavailable to Defendant Callahan.  The Court notes that

Plaintiffs have produced evidence suggesting that, for much of the time jail nurses were

performing their duties, they were completely unsupervised.  *See* Pls' App. at 313 (where

Defendant Callahan testified that if Dr. Bolin was not supervising the nurses in their professional

activities, then no one was), 276-77 (where Dr. Bolin testified that he was not the nurses'

supervisor and that he only supervises jail nurses when he is physically present at the jail

facilities or if the nurses call him on the phone), 430-437 (where jail nurses averred that they

feared calling Bolin for fear of unwarranted criticism).  Plaintiffs have also produced evidence

suggesting that Callahan handled Bolin's custom of nurse intimidation by merely asking Bolin to

---

[14]The Court notes that it was clearly established at the time in question that pretrial detainees have a Fourteenth Amendment right not to have their serious medical needs met with deliberate indifference by jail officials.  *Hare,* 74 F.3d at 650.

"sweeten up" and by telling the jail nurses to put up with it, also suggesting supervisory incompetence. Furthermore, evidence that Callahan discussed the death of an inmate with the jail physician only "in passing," and only briefly met with Nurse Krajca after Brown's death for the limited purpose of making sure she had not lied about relying on jail standing orders similarly raises genuine issues of fact regarding whether the defense of qualified immunity is available.

Accordingly, the Court finds that factual issues exist precluding the Court from granting summary judgment on the ground of qualified immunity, and Defendant Callahan's Motion for Summary Judgment is hereby **DENIED** as to Plaintiffs' claims under the Fourteenth Amendment.

**B.      Plaintiffs' ADA and Rehabilitation Act claims against Callahan individually**

Defendant Callahan also moves for summary judgment on Plaintiffs' claims under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

A review of Plaintiffs' amended complaint demonstrates that Plaintiffs do not assert any ADA or Rehabilitation Act claims against Callahan. *See* Doc. # 41 at 15.

Accordingly, the Court finds that Defendant Callahan's motion for summary judgment as to Plaintiffs ADA and Rehabilitation Act claims should be and is hereby **DENIED** as moot.

**C.      Plaintiffs' state law tort claims against Callahan individually**

Defendant Callahan moves for summary judgment on Plaintiffs' claims under the Texas Survival Statute and Texas Wrongful Death Act.

The Court dismissed Plaintiffs' state law tort claims against Defendant Callahan when it

granted Defendant Wichita County's motion for judgment on the pleadings.

Accordingly, Callahan's Motion for Summary Judgment with respect to Plaintiffs' state law claims is hereby **DENIED** as moot.

The Court now considers Defendant Callahan, in his official capacity, and Wichita County's motion for summary judgment.

**D.      Plaintiffs' failed to respond to Callahan and the County's motion**

Plaintiffs did not respond to Callahan and the County's motion for summary judgment. However, summary judgment may not be awarded by default merely because the nonmoving party has failed to respond. *See Hibernia Nat'l Bank v. Administraction Cent. Sociedad Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985); *see also Ford-Evans v. Smith*, 206 Fed.Appx. 332, 334 (5th Cir. 2006). A motion for summary judgment cannot be granted simply because there is no opposition, even if failure to oppose violated a local rule. *Simco Enterprises, Ltd. v. James River Ins. Co.*, 566 F.Supp.2d 555, 560 (E.D. Tex. 2008). The movant has the burden of establishing the absence of a genuine issue of material fact and, unless he has done so, the court may not grant the motion, regardless of whether any response was filed. *Hetzel v. Bethlehem Steel Corp.,* 50 F.3d 360, 362 n.3 (5th Cir. 1995) (quoting *Hibernia Nat'l Bank*, 776 F.2d at 1279); *see also Owens v. Town of Delhi*, 469 F.Supp.2d 403, 405 (W.D. La. 2007); *Royal Surplus Lines Inc. Co. v. Brownsville Indep. Sch. Dist.,* 404 F.Supp.2d 942, 947 (S.D. Tex. 2005). In making its determination on the motion, the court looks at the full record including the pleadings, depositions, answers to interrogatories, admissions, and affidavits. Fed. R. Civ. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Thus, the Court will consider all evidence before the Court, including evidence submitted by Plaintiffs in response to other

Defendants' summary judgment motions, in resolving Callahan and the County's motion for summary judgment.

**E.       Plaintiffs' § 1983 claims against Callahan in his official capacity**

Defendant Callahan moves for summary judgment with respect to Plaintiffs' § 1983 claims brought against him in his official capacity.  Callahan and the County argue that Plaintiffs' official capacity claims against Callahan should be dismissed as duplicative of the claims against the County.

Official capacity suits are another way of pleading an action against an entity of which an officer is an agent.  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  The Fifth Circuit has noted that a district court correctly dismisses allegations against municipal officers in their official capacities when the respective governmental entity is defending in the suit, as the official capacity allegations duplicate claims against the government entity.  *Romero v. Becken*, 256 F.3d 349 (5th Cir. 2001); *Barrow v. Greenville Indep. Sch. Dist.*, 3:00 -CV-913-D, 2000 WL 34226872 at *1 (N.D. Tex. July 14, 2000) (J. Fitzwater, presiding).

Plaintiffs' amended complaint asserts claims against Defendant Callahan in his official capacity.  *See* Doc. # 41.  In addition, the relevant governmental entity, Wichita County, Texas, is defending in this action.  Accordingly, the Court finds it appropriate to dismiss Plaintiffs' official capacity claims against Defendant Callahan as duplicative of their claims against Wichita County.

Accordingly, Defendant Callahan and Wichita County's Motion for Summary Judgment with respect to official capacity claims asserted against Defendant Callahan should be and is

hereby **GRANTED**.

**F.        Plaintiffs' § 1983 claims against Wichita County**

Plaintiffs bring claims against Wichita County pursuant to 42 U.S.C. § 1983 for alleged violations of the Fourth and Fourteenth Amendments.  The Court now considers summary judgment with respect to these claims.

**1.        Plaintiffs' Fourth Amendment claim against Wichita County**

Defendant Wichita County  moves for summary judgment on Plaintiffs' 42 U.S.C. § 1983 claims under the Fourth Amendment, and argues that since Henson was a pretrial detainee at the time of the alleged constitutional violation, the Fourth Amendment is inapplicable.

As discussed above, there is no issue of fact that Henson was a pretrial detainee at the time his constitutional rights were allegedly violated, and therefore summary judgment is appropriate with respect to Plaintiffs' Fourth Amendment claims.

Accordingly, Defendant Wichita County's Motion for Summary Judgment with respect to Plaintiffs' § 1983 claims based on a violation of the Fourth Amendment should be and is hereby **GRANTED.**

**2.        Plaintiffs' Fourteenth Amendment Claim against Wichita County**

Municipalities cannot be held liable under 42 U.S.C. § 1983 on the basis of *respondeat superior.  Bd. of County Commissioners of Bryan County, Okl. v. Brown*, 520 U.S. 397, 415-16 (1997).  A plaintiff may demonstrate municipal liability based on: (1) a formally adopted municipal policy; (2) an informal custom or practice; (3) a custom or policy of inadequate training, supervision, discipline, screening, or hiring; or (4) a single act by an official with final policymaking authority.  *Monell*, 436 U.S. at 694 (establishing that § 1983 municipal liability

may be based on an officially adopted and promulgated policy); *Johnson v. Moore, III*, 958 F.2d 92, 94 (5th Cir. 1992) (noting that municipal liability may be founded on a persistent or widespread practice of which actual or constructive knowledge is attributable to the policymaking authority); *City of Canton,* 489 U.S. at 385-87 (providing that inadequacy of training may serve as a basis for municipal liability where the failure to train amounts to deliberate indifference to the rights of persons); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986) (establishing that isolated actions or decisions by a municipal policymaker with "final policymaking authority" may create municipal liability).

In this case, Plaintiffs have raised genuine issues of fact regarding whether Defendant Callahan, sheriff of Wichita County jails, can be held personally liable for failing to supervise jail nurses and Dr. Bolin, as well as for adopting, maintaining, or acquiescing to a custom that was the moving force behind the constitutional harms at issue here.  The Court finds that this evidence also raises issues regarding liability on behalf of Wichita County.  Because Defendant Callahan is a final policymaker with respect to the Wichita County jails, the fate of the County hinges on resolution of Plaintiffs' failure to supervise and policy/custom claims against Defendant Callahan.[15]  *See Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir. 1994) (indicating that an individual supervisor's liability and the liability of a municipality are considered under the same standards of fault and causation); *see also Turner v. Upton County*, 915 F.2d 133, 136 (5th Cir. 1990) (stating that, in Texas, the sheriff is the county's final policymaker in the area of law enforcement by virtue of the sheriff's election to office); TEX.

---

[15]  The Court notes that Plaintiffs also allege that the County can be held liable for Dr. Bolin's custom of nurse intimidation/discouragement because the court of commissioners delegated policymaking authority to Dr. Bolin.  *See* Doc. # 41 at 13. The County and Callahan do not address this allegation in their motion for summary judgment, and the Court declines to address the issue *sua sponte*.

LOCAL GOV'T CODE ANN. § 351.041(a) (Vernon Ann. 2007) (sheriff is the keeper of the jail). Because genuine issues of material fact exist regarding these claims, summary judgment as to the County is inappropriate.[16]

Accordingly, Defendant Wichita County's Motion for Summary Judgment with respect to Plaintiffs' § 1983 claims based on a violation of the Fourteenth Amendment should be and is hereby **DENIED.**

### 3.      Punitive Damages

The County asks for summary judgment with respect to Plaintiffs' request for punitive damages against the County pursuant to 42 U.S.C. 1983.

It is well-settled that section 1983 does not authorize punitive damages against local government entities.  *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 270-71 (1981).

Accordingly, Defendant Wichita County's Motion for Summary Judgment with respect to Plaintiffs' § 1983 claims for punitive damages based on a violation of the Fourteenth Amendment should be and is hereby **GRANTED.**

### G.      Plaintiffs' ADA and Rehabilitation Act claims against Wichita County

Wichita County moves for summary judgment with respect to Plaintiffs' ADA and Rehabilitation Act claims against it.

---

[16]The Court does not find persuasive the County's argument that they cannot be held liable because Nurse Krajca moved Henson to medical solitary on November 27, 2004 for a legitimate peniological purpose, specifically, to move Henson to a smoke-free environment.  First, there is a dispute in the evidence as to why Henson was moved to medical solitary.  *See* Doc. # 143 at 73-86; Pls' App at 438; Def's Reply at 691-94. In addition, regardless of whether smoke inhalation was a consideration, Plaintiffs have produced evidence suggesting that Nurse Kracja moved Henson to solitary even though she was aware that he was in need of additional care above and beyond being moved to medical solitary. *See* Doc. # 143 at 21-25, 85-86.  Similarly, the Court does not find, as urged by Defendants, that the fact that Wichita County had a Health Services plan in place that was approved by the Texas Commission on Jail Standards insulates the County from liability where there is evidence of a custom that nurses were discouraged from seeking emergency care for inmates with serious medical needs.

Title II of the ADA and section 504 of the Rehabilitation Act provide that no qualified individual with a disability shall, by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination.  Here, Plaintiffs assert that Henson was discriminated against because of his disability of emphysema/COPD.  In other words, Plaintiffs allege that Henson was denied medical care to treat his emphysema/COPD because of his emphysema/COPD.  The Court finds that Plaintiffs have failed to identify specific evidence in the record supporting Plaintiffs' allegation that Henson was discriminated against because of his emphysema/COPD.  *See Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).  While Plaintiffs have produced evidence suggesting that Henson had emphysema/COPD and did not receive adequate medical attention for this condition, Plaintiffs have failed to produce any evidence suggesting that Henson did not receive medical attention because he was discriminated against for having emphysema/COPD.

Accordingly, Defendant Wichita County's motion for summary judgment with respect to Plaintiffs ADA and Rehabilitation Act claims should be and is hereby **GRANTED**.

**H.      Plaintiffs' state law tort claims against Wichita County**

The County moves for summary judgment with respect to Plaintiffs' claims under the Texas Wrongful Death Act and the Texas Survival Act.  The County argues that Plaintiffs cannot recover under the Texas Wrongful Death Act because this act excludes Texas counties from liability under the act.

Plaintiffs' amended complaint indicates that Plaintiffs are not asserting claims under the Texas Wrongful Death Act against Wichita County.  Accordingly, the Court finds that the County's motion for summary judgment with respect to Plaintiffs' Wrongful Death Act claim is

hereby **DENIED** as moot.

With respect to Plaintiff Reed's tort claims brought pursuant to the Texas Survival Statute, the County offers no argument or evidence in support of its motion for summary judgment, and does not otherwise point to an absence of evidence to support this claim. Accordingly, the Court finds summary judgment inappropriate with respect to this claim.[17]

Accordingly, the County's motion for summary judgment with respect to Plaintiff Reed's state law tort claim brought pursuant to the Texas Survival Statute is hereby **DENIED**.

IV.     Conclusion

For the foregoing reasons, the Court finds that Defendant Callahan's Motion for Summary Judgment in His Individual Capacity should be and is hereby **GRANTED in part** and **DENIED in part**.  The Court finds that genuine issues of material fact exist regarding Plaintiffs' claims under the Fourteenth Amendment brought pursuant to 42 U.S.C. § 1983; that no ADA, Rehabilitation Act, and state law claims are currently pending against Callahan; and that Plaintiffs' claim under the Fourth Amendment is hereby **DISMISSED** with prejudice.

In addition, the Court finds that Defendant Callahan, in His Official Capacity, and Defendant Wichita County's Motion for Summary Judgment should be and is hereby **GRANTED in part**, and **DENIED in part**.  The Court finds that official capacity against Defendant Callahan should be and are hereby **DISMISSED** as duplicative of claims against the County.

---

[17]  The Court notes that the County's motion requests generally that the Court rule that the County cannot be held liable for punitive damages.  However, the motion fails to cite any law or evidence in support of this request in connection with Plaintiff's claim under the Texas Survival Statute. Accordingly, the Court declines to grant summary judgment with respect to the County's liability for punitive damages in connection with this claim.

The Court further finds that genuine issues of material fact exist regarding Plaintiffs' claims asserted against the County under the Fourteenth Amendment, brought pursuant to 42 U.S.C. § 1983, although Plaintiffs may not recover punitive damages from the County with respect to this claim;  Plaintiffs have not alleged Wrongful Death Act claims against the County; the County has failed to demonstrate that summary judgment should be granted as to Plaintiff Reed's state law tort claims brought pursuant to the Texas Survival Act; and Plaintiffs' claims under the Fourth Amendment, ADA, and Rehabilitation Act are hereby **DISMISSED** with prejudice.

**SO ORDERED** on this **4**th day of **August, 2009**.


Reed O'Connor
**UNITED STATES DISTRICT JUDGE**